LEH ET AL. *v.* GENERAL PETROLEUM CORP. ET AL.

No. 4.   Argued October 11, 1965.—Decided November 8, 1965.

*Richard G. Harris* argued the cause for petitioners. With him on the brief was *Maxwell Keith.*

*Francis R. Kirkham* argued the cause for respondents. With him on the brief were *Jack E. Woods, Moses Lasky,*

*Edmund D. Buckley, Wayne H. Knight, Howard Painter, William E. Mussman, Thomas E. Haven* and *George W. Jansen.*

MR. JUSTICE WHITE delivered the opinion of the Court.

On September 28, 1956, petitioners, a partnership engaged in wholesale distribution of refined petroleum products and one of the partners, filed in the Southern District of California a treble-damage action charging violations of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2 (1964 ed.), against seven companies engaged in producing, refining, and marketing gasoline and other hydrocarbon substances in interstate commerce. Defendants contended that the action was barred by the California one-year statute of limitations applicable to suits for statutory penalties or forfeitures, Cal. Code Civ. Proc. § 340 (1). Plaintiffs conceded that their cause of action accrued no later than February 1954, and that the four-year limitation provision added to the Clayton Act in 1955, Clayton Act § 4B, 69 Stat. 283, 15 U. S. C. § 15b (1964 ed.), was not applicable to a right of action accruing in 1954. But plaintiffs contended that the governing provision was the California three-year statute of limitations respecting actions on a statutory liability other than a penalty, Cal. Code Civ. Proc. § 338 (1), and that in any event the running of the statute of limitations was tolled by § 5 (b) of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 16 (b) (1964 ed.), because of a civil antitrust proceeding that was commenced by the United States in 1950 and was still pending when plaintiffs filed ·their complaint. Section 5 (b) provides that during the pendency of a civil or criminal proceeding instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, the running of the statute of limitations shall be suspended in respect of every private right of action "based in whole or in part on any matter

complained of in said proceeding."[1]   The lower courts upheld the defense of limitations and dismissed the complaint, holding that the one-year statute governed and that plaintiffs were not entitled to the benefit of § 5 (b). 208 F. Supp. 289 (D. C. S. D. Cal. 1962), aff'd, 330 F. 2d 288 (C. A. 9th Cir. 1964).  We granted certiorari limited to the question of the applicability of § 5 (b), 379 U. S. 877, because of an apparent conflict between this case and *Union Carbide & Carbon Corp.* v. *Nisley,* 300 F. 2d 561 (C. A. 10th Cir. 1962), dismissed under Rule 60 *sub nom. Wade* v. *Union Carbide & Carbon Corp.,* 371 U. S. 801, concerning interpretation of the statutory requirement that the private action for which the benefit of the tolling provision is sought be "based in whole or in part on any matter complained of" in the government proceeding.  We conclude that the lower courts misapplied § 5 (b), and we reverse the judgment below.

Prior to the present case, the Court of Appeals for the Ninth Circuit had declared a restrictive interpretation of § 5 (b).  In *Steiner* v. *20th Century-Fox Film Corp.,* 232 F. 2d 190 (1956), that court ruled that the scope of § 5 (b) was determined by the principles of collateral estoppel applicable under § 5 (a) of the Clayton Act, as amended, 69 Stat. 283, 15 U. S. C. § 16 (a) (1964 ed.), which provides that a final judgment or decree

---

[1] Section 5 (b), 15 U. S. C. § 16 (b), provides:

"(b) Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

rendered in a suit by the United States and holding a defendant in violation of the antitrust laws shall be prima facie evidence in a private antitrust action against such defendant "as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto." [2] Accordingly, the court declared in *Steiner* that "[a] greater similarity is needed than that the same conspiracies are alleged. The same means must be used to achieve the same objectives of the same conspiracies by the same defendants." 232 F. 2d, at 196. In the present case the Court of Appeals purported to follow *Steiner* and concluded that the running of the statute of limitations was not suspended because here, in the court's opinion, "there were not only different overt acts charged, but different conspiracies, occurring at different times, between different parties." 330 F. 2d, at 301; see also 208 F. Supp., at 294–295. Conflicting with *Steiner* and the present case is *Union Carbide & Carbon Corp.* v. *Nisley, supra,* which held that the evidentiary rules of estoppel are not determinative and that the running of the period of limitations is tolled by § 5 (b) if there is "substantial identity of subject matter." 300 F. 2d, at 570.

---

[2] Section 5 (a), 15 U. S. C. § 16 (a), provides:

"(a) A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title."

See generally *Emich Motors Corp.* v. *General Motors Corp.*, 340 U. S. 558.

*Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.*, 381 U. S. 311, which was decided in the interim between the granting of certiorari and oral argument in the present case, establishes certain basic principles for the construction of § 5 (b) that are to be followed here. The questions presented for decision in *Minnesota Mining* were whether proceedings by the Federal Trade Commission under § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18 (1964 ed.), activate § 5 (b) to the same extent as judicial proceedings and, if so, whether the claim of New Jersey Wood, the private plaintiff, was based on "any matter complained of" in the Commission action. One of the arguments advanced with respect to the first question was that Commission proceedings did not suspend the running of limitations because, it was asserted, any Commission order that might issue would not be admissible under § 5 (a). We rejected this contention that § 5 (a) and § 5 (b) were coextensive.

"It may be . . . that when it was enacted the tolling provision was a logical backstop for the prima facie evidence clause of § 5 (a). But even though § 5 (b) complements § 5 (a) in this respect by permitting a litigant to await the outcome of government proceedings and use any judgment or decree rendered therein . . . it is certainly not restricted to that effect. As we have pointed out, the textual distinctions as well as the policy basis of § 5 (b) indicate that it was to serve a more comprehensive function in the congressional scheme of things. The Government's initial action may aid the private litigant in a number of other ways. The pleadings, transcripts of testimony, exhibits and documents are available to him in most instances. . . . Moreover, difficult questions of law may be tested and defini-

tively resolved before the private litigant enters the fray. The greater resources and expertise of the Commission and its staff render the private suitor a tremendous benefit aside from any value he may derive from a judgment or decree. Indeed, so useful is this service that government proceedings are recognized as a major source of evidence for private parties." 381 U. S., at 319.

*Minnesota Mining* sweeps away much of the foundation for the *Steiner* view of the scope of § 5 (b). The private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants. Rather, effect must be given to the broad terms of the statute itself—"based *in whole or in part* on *any matter* complained of" (emphasis added)—read in light of Congress' "belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." 381 U. S., at 318. Doubtlessly, care must be exercised to insure that reliance upon the government proceeding is not mere sham and that the matters complained of in the government suit bear a real relation to the private plaintiff's claim for relief. But the courts must not allow a legitimate concern that invocation of § 5 (b) be made in good faith to lead them into a niggardly construction of the statutory language here in question. With those matters in mind we now turn to a comparison of plaintiffs' complaint with the complaint in the government proceeding on which plaintiffs rely, *United States* v. *Standard Oil Co. of California*, Civil No. 11584–C, D. C. S. D. Cal.[3]

---

[3] The case has since been terminated by consent judgments entered into by all defendants except the Conservation Committee of California Oil Producers and Texaco, Inc., as to each of which the case was dismissed. See 1958 CCH Trade Cases, ¶ 69,212; 1959 CCH Trade Cases, ¶ 69,240; 1959 CCH Trade Cases, ¶ 69,399.

The complaint of the United States charged that seven petroleum companies and the Conservation Committee of California Oil Producers had conspired together to restrain and to monopolize interstate commerce in the Pacific States area in violation of §§ 1 and 2 of the Sherman Act, beginning in or about the year 1936, and continuing up to and including the date suit was filed in 1950. The complaint divided the conspiracy into two principal branches: (1) agreement by the defendants to eliminate competition among themselves in the Pacific States area and (2) agreement by the defendants to utilize their control of the production, transportation, refining, and marketing of crude oil and refined petroleum products to restrict and to eliminate the competition of independent producers, refiners and marketers in the Pacific States area. In furtherance of the first branch of the conspiracy, the complaint further charged, defendants had conspired to do and had actually accomplished the following things, among others: sharing wholesale and retail markets with each other by selling gasoline and other refined petroleum products at identical prices, thus confining effective competition among themselves to the advertising of brand names and to the offering of free services in their retail outlets; fixing and maintaining uniform and noncompetitive prices for the sale of gasoline and other refined petroleum products at wholesale and at retail; refusing to sell their petroleum products to any wholesale or retail distributor who failed or refused to follow the prices fixed by them; and refusing to sell their petroleum products to any wholesale distributor, jobber, or retail dealer except on a "full-requirements" or "exclusive-dealer" basis. Among acts and agreements charged as having been accomplished in furtherance of the second branch of the conspiracy were the following: coercing independent producers into limiting production of crude oil through production quotas estab-

lished by the defendant Conservation Committee; limiting the supply of crude oil available to independent refiners and refusing to sell crude oil to such refiners; acquiring control of independent refiners; inducing independent refiners to shut down their productive capacity or to dismantle their refining facilities in return for an agreement to furnish such independent refiners with their full requirements of gasoline and other refined petroleum products; foreclosing independent wholesale and retail markets otherwise available to the independent refiners by requiring independent jobbers, wholesalers, and retailers to handle exclusively the refined petroleum products of defendants.

Plaintiffs' amended complaint in the present case also charged a conspiracy to violate §§ 1 and 2 of the Sherman Act. The period of the conspiracy of which plaintiffs complained varied somewhat from that charged in the government action, plaintiffs alleging that the conspiracy herein commenced in or about the year 1948 (the year in which plaintiffs commenced business) and continued until the date of the filing of the complaint in 1956. The defendants were the same as those in the government proceeding, except that Shell Oil Company and the Conservation Committee of California Oil Producers were named as defendants in the government suit and were not defendants here, and Olympic Oil Company was named as a defendant here and was not a defendant in the government proceeding.[4] The complaint charged that defendants had agreed to restrain and to monopolize the wholesale and retail distribution of refined gasoline throughout the southern California area by excluding independent jobbers from such distribution and by eliminating the jobbers' customers, i. e., retail outlets, and

---

[4] Olympic was dismissed from the case prior to the ruling on defendants' statute of limitations defense.

preventing those customers from competing with retail outlets owned and operated by defendants. In particular, defendants were alleged to have accomplished their unlawful purposes by the following acts: controlling the sale and distribution of refined gasoline in the southern California area; denying independent jobbers access to a source of supply of refined gasoline; preventing independent jobbers from obtaining refined gasoline from other sources; preventing the customers of independent jobbers from obtaining gasoline with which to compete with retail service stations and outlets operated or controlled by defendants; maintaining fixed, artificial, and noncompetitive prices for the wholesale and retail sale of refined gasoline in the southern California area and fixing the price at which gasoline would be sold, if at all, to independent dealers and jobbers; and generally controlling the sources of refined gasoline in the southern California area and preventing and precluding independent jobbers from obtaining a source of supply. Plaintiffs claimed injury to their independent jobber business through a loss of profits resulting from price-fixing and from the destruction of their business because of the termination of their source of supply.

The lower courts found that plaintiffs' complaint was not based in whole or in part on any matter complained of in the government proceeding principally because of the differences in the defendants named in the two suits and in the period of the conspiracies alleged. See 330 F. 2d, at 301; 208 F. Supp., at 294–295. We cannot agree that these differences bar resort to the tolling provision in this case.

Here too we may find guidance in *Minnesota Mining.* In that case, the plaintiff, a manufacturer of electrical insulation materials, brought suit against Minnesota Mining and Manufacturing Company and the Essex Wire Corporation, the complaint alleging violations of § 7 of

the Clayton Act and §§ 1 and 2 of the Sherman Act. The substance of the complaint concerned the acquisition by Minnesota Mining from Essex of Insulation and Wires, Inc., which thereafter ceased to distribute plaintiff's products, and an alleged conspiracy between Minnesota Mining and Essex to restrain trade in electrical insulation products. The action upon which plaintiff relied as suspending the running, of limitations was a Federal Trade Commission proceeding under § 7 against Minnesota Mining but not against Essex. Essex was not a party to the interlocutory appeal in the private action and no contention was made here that the difference in parties prevented tolling of limitations as to Minnesota Mining. Minnesota Mining did argue that because of the greater burden of proof under the Sherman Act, plaintiff's Sherman Act claims could not be held to be based in part on any matter complained of in the Clayton Act proceeding before the Commission. This Court found that "both suits set up substantially the same claims," 381 U. S., at 323, and rejected Minnesota Mining's argument.

Just as in *Minnesota Mining* the differences between Sherman Act and Clayton Act proceedings were held not to require the conclusion that the private action under the Sherman Act was not based in part on any matter complained of in the Government's § 7 suit, so here we cannot conclude that a private claimant may invoke § 5 (b) only if the conspiracy of which he complains has the same breadth and scope in time and participants as the conspiracy described in the government action on which he relies. Here there is substantial identity of parties, six of the seven defendants in this case being defendants in the government suit as well. In suits of this kind, the absence of complete identity of defendants may be explained on several grounds unrelated to the question of whether the private claimant's suit is based on mat-

ters of which the Government complained. In the interim between the filing of the two actions it may have become apparent that a party named as a defendant by the Government was in fact not a party to the antitrust violation alleged. Or the private plaintiff may prefer to limit his suit to the defendants named by the Government whose activities contributed most directly to the injury of which he complains. On the other hand, some of the conspirators whose activities injured the private claimant may have been too low in the conspiracy to be selected as named defendants or co-conspirators in the Government's necessarily broader net. The overlap in the time periods of the two conspiracies is less complete, but this disparity is equally without significance. That plaintiffs alleged a conspiracy corresponding in time to the period during which they were in business obviously does not mean that this conspiracy is not based in part on matters complained of by the Government. Nor can that conclusion be drawn from the fact that plaintiffs focus on the southern California area, which is only a part of the Pacific States area with which the Government was concerned.

It is obvious from a comparison of the two complaints that plaintiffs' suit is based in part on matters of which the Government complained. The Government charged that defendants had conspired to eliminate the competition of independent marketers; plaintiffs charged a conspiracy to eliminate independent jobbers and retailers. Both the plaintiffs and the Government alleged that defendants had fixed prices at wholesale and at retail. The Government alleged that defendants had conspired to eliminate the competition of independent refiners by acquiring such refiners, limiting the supply of crude oil available to them, and inducing them to shut down their refining facilities; plaintiffs complained that defendants had denied them a source of supply and prevented them

from obtaining gasoline from other sources. To require more detailed duplication of claims would be to resurrect the collateral estoppel approach declared in *Steiner* and rejected by this Court in *Minnesota Mining*.

Defendants contend, however, that during the extensive discovery proceedings that preceded the ruling on the motion to dismiss, plaintiffs made certain concessions establishing that, whatever the complaint may allege, plaintiffs' claim in fact is not based at all on any matter complained of by the Government in *Standard Oil*. Plaintiffs' real claim, defendants say, is that they had an arrangement with Olympic Refining Company under which they were to be supplied with gasoline as long as Olympic was in turn supplied by defendant General Petroleum Corporation, that defendant Standard Oil Company of California replaced General Petroleum Corporation as Olympic's supplier in February 1954, and that plaintiffs' supply was thereby terminated. The attorney for plaintiffs stated in a hearing before the trial court that General Petroleum Corporation had the absolute right to terminate its supply to Olympic at any time and that if General had in this case done so unilaterally plaintiffs would not be in court. But plaintiffs contended that defendants conspired together to effect the termination of General's supplier relationship with Olympic. Defendants argue that this conspiracy to terminate a particular supply contract is far removed from the matters with which the government complaint was concerned.

In general, consideration of the applicability of § 5 (b) must be limited to a comparison of the two complaints on their face. Obviously suspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint. *Minnesota Mining & Mfg. Co.* v. *New*

*Jersey Wood Finishing Co.*, 381 U. S. 311, 316. Equally, the availability of § 5 (b) to the private claimant may not be made dependent on his ability to prove his case, however fatal failure may prove to his hopes of success on the merits.

Moreover, defendants' argument contains a basic flaw in that it does not take account of all that plaintiffs' counsel said. The relationship between plaintiffs and General was one of subdistributorship, and there were accordingly two levels in the chain of distribution between General and the ultimate retail outlet. Plaintiffs claimed, counsel said, that pressure was exerted to terminate the relationship between General and Olympic, and thereby between Olympic and plaintiffs, as the result of an industry commitment to do away with subdistributorship operations "because the sub-distributorship could not be controlled. The gasoline could be controlled, obviously, when General Petroleum sold it directly at retail. The gasoline could be controlled if you had a good company as opposed to a bad company, which was acting as a distributor. But the gasoline could not be controlled when it went to the sub-distributorship level." Clearly this is a claim that in order to obtain and to maintain control of distribution and retail marketing, including the control and fixing of uniform wholesale and retail prices of which the government action complained, defendants agreed to tighten control of the chain of distribution through elimination of independent jobbers acting as subdistributors. Counsel's statements simply filled out the details of the general allegations of the complaint.

As we have concluded that the running of the statute of limitations was suspended, the judgment must be

*Reversed.*

MR. JUSTICE HARLAN and MR. JUSTICE FORTAS took no part in the consideration or decision of this case.