MORTON'S MARKET, INC.;  J & J Produce and Deli, Inc., Plaintiffs-Appellants,

v.

GUSTAFSON'S DAIRY, INC., Defendant,

Borden, Inc.;  T.G. Lee Foods, Inc., et al., Defendants-Appellees.

No. 98-2498.

United States Court of Appeals,

Eleventh Circuit.

Dec. 20, 1999.

Appeals from the United States District Court for the Middle District of Florida. (Nos. 93-1077-CIV-T-23b, 93-1264-CIV-23A, 94-1437-CIV-T23A,95-35-CIV-23B), Steven D. Merryday, Judge.

Before ANDERSON, Chief Judge, HILL, Senior Circuit Judge, and COOK[*], Senior District Judge.

HILL, Senior Circuit Judge:

Plaintiffs brought these consolidated antitrust actions against most of the large dairy producers in Florida.  The district court held the actions time-barred and granted summary judgment for the defendants.  Both plaintiffs appeal.

I.

J & J Produce & Deli, Inc. and Morton's Market, Inc. are retailers of milk.  Gustafson's Dairy, Inc., Borden, Inc., Pet, Inc., Flav-O-Rich, Inc., the Southland Corporation, T.G. Lee Foods, Inc., and McArthur Dairy,Inc. (the Dairies) engaged in the production and sale of milk in Florida.  The parties agree on the following facts.

Beginning in the early 1970s, the Dairies conspired and combined to rig their bids for contracts to supply milk to the public school districts in Florida.  The Dairies submitted artificial bids and effectively divided the school milk market among themselves.

---

[*]Honorable Julian Abele Cook, Jr., Senior U.S. District Judge for the Eastern District of Michigan, sitting by designation.

In mid-1987, the United States and the State of Florida began investigating anti-competitive activities in the dairy industry. During July and August of 1987, Florida's Attorney General subpoenaed documents from and deposed employees of many dairies operating in Florida. On February 16, 1988, Florida filed a civil lawsuit against ten dairies, many individuals, and certain milk distributors. The complaint alleged that the Dairies violated federal antitrust laws. Florida also alleged that the defendants fraudulently concealed their activities by secretly conducting meetings and confining to key individuals information regarding the Dairies' efforts unreasonably to restrain trade.

The investigations, criminal charges, and civil action were reported in February 1988, by the major newspapers in Florida. The newspaper articles discussed the Dairies' agreements among themselves to rig bids for school milk and revealed that the federal government was also scrutinizing the industry. Edmund Morton, the president of Morton's Market, read at least some of these articles. The principal of J & J Produce and Deli heard from her spouse that Florida had sued the Dairies. The plaintiffs did not, however, undertake any investigation into whether the Dairies were also fixing the price of milk to retailers.

During late 1987 and early 1988, the United States Department of Justice charged the Dairies and some of their employees with criminal antitrust violations. Several individuals pled guilty to rigging bids for school milk contracts. Between 1990 and 1992, all of the Dairies, except Gustafson's, pled guilty to conspiring to rig bids for school milk contracts. Information regarding price-fixing of wholesale milk prices was contained in each of these guilty pleas, the first of which occurred in December of 1990. Gustafson's was charged with price-fixing in May of 1992, and pled guilty in August to conspiring to fix the prices of milk in Florida and Georgia between the early 1970s through at least August of 1988.

On July 1, 1993, subsequent to the government proceedings, plaintiffs each filed an antitrust action under Section 4 of the Clayton Act, 15 U.S.C. § 15 (the Act), on behalf of itself and a class of direct purchasers of dairy products in Florida. Both actions assert that the Dairies fixed, raised and maintained the wholesale prices of dairy products to commercial customers by collusive agreements in violation of the Sherman Act, 15 U.S.C. § 1.

The Dairies moved for summary judgment, contending that these actions are time-barred by the Act's four-year statute of limitations. 15 U.S.C. § 15(b). They assert that their price-fixing activities, if any, terminated in 1987 or 1988, with their school bid-rigging prosecutions, more than four years before these actions were filed in 1993. Plaintiffs countered that the price-fixing conspiracy continued until 1992, when Gustafson's pled guilty to fixing the price of milk in Florida. Plaintiffs also contended that the statute of limitations was tolled in this case by the Dairies' fraudulent concealment of their price-fixing activities,[1] and by the Clayton Act itself, which tolls the running of the statute during government proceedings concerning related violations. 15 U.S.C. § 16(i). Additionally, Pet and Southland claimed that they withdrew from the alleged conspiracy in 1985 and 1988 respectively, and that plaintiffs did not timely file as to them.

The district court granted the Dairies' motions for summary judgment. We review this grant of summary judgment *de novo* applying the same standards as the district court. *Industrial Partners, Ltd. v. CSX Transp., Inc.* 974 F.2d 153 (11th Cir.1992). For the following reasons, we reverse those judgments.

II.

There has been considerable confusion in this case over the application of the statute of limitations and the impact of equitable or statutory tolling of it. Some of this confusion has been created by the failure of both parties to distinguish between the accrual of an antitrust cause of action and the scope of damages available in such an action. We cannot know whether plaintiffs' actions are time-barred unless we know when the statute began to run. Once we know when the statute began to run, we can determine whether and how it was tolled in this case and what impact that tolling has on the scope of plaintiffs' damages.

A.    *The Commencement of the Statute of Limitations*

---

[1] The district judge who originally presided in the J & J Produce case denied Gustafson's motion to dismiss on the statute of limitations issue, specifically holding that the price-fixing conspiracy "had been continuous at least until 1992" and that plaintiff's fraudulent concealment claim "has merit." In December of 1994, plaintiffs in both cases settled with Gustafson's. Upon court approval of the settlement, Gustafson's was to pay $1.5 million to the class and provide cooperation in the action against the remaining dairies. In January, plaintiffs moved for approval of the settlement, but, before it could be granted, the J & J Produce case was transferred to the district judge who had the Morton's Market case, and the two cases were consolidated. After much delay, on October 30, 1997, the district judge, without oral argument, granted the Dairies' motions for summary judgment on the statute of limitations issue. Almost a year later, the district court granted preliminary approval of the settlement with Gustafson's.

Under the antitrust laws, "a cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures the plaintiffs' business." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). A plaintiff must file his claim within four years following defendant's injurious act. 15 U.S.C. § 15(b). Suit may be brought more than four years after the events that initially created the cause of action only if the action is commenced within four years after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a "continuing antitrust violation." *Zenith,* 401 U.S. at 338, 91 S.Ct. 795.[2]

An act constitutes a "continuing violation," if it injures the plaintiff over a period of time. Even though the illegal act occurs at a specific point in time, if it inflicts "continuing and accumulating harm" on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). For example, when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). As a cause of action accrues with each sale, the statute of limitations begins to run anew.

> Antitrust law provides that, in the case of a "continuing violation," say a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Id.* 521 U.S. at 189, 117 S.Ct. 1984 (quoting 2 Areeda, ¶ 338b, at 145).

Plaintiffs allege such a continuing price-fixing conspiracy. Plaintiffs claim that the Dairies conspired to fix the retail prices of milk in Florida over a twenty-year period, and that sales at these fixed prices continued at least until 1992, when Gustafson's pled guilty to price-fixing. Thus, even if there were no

---

[2]Of course, suit may also be brought more than four years after accrual of the antitrust cause of action if the statute is tolled for some reason.

price-fixing conversations after 1987, as the Dairies contend,[3] if plaintiffs purchased milk at a fixed price after that date, the purchase would constitute an overt act that injured it. A cause of action would accrue with each purchase and a new statutory period would begin to run. *See Zenith,* 401 U.S. at 338, 91 S.Ct. 795.

The commencement of the statute of limitations is a question of fact. *In re Beef Indust. Antitrust Litig.,* 600 F.2d 1148, 1169-70 (5th Cir.1979). It cannot be determined upon motion for summary judgment if there is a genuine question as to when it began to run. *Id.* Upon motion for summary judgment, the district court's task was simply to determine whether a genuine question was presented for trial. The district court held there was not. The court found that "the record reveals that any price-fixing activity occurred concurrently with the bid-rigging"[4] and "the record lacks any competent evidence that the defendants unlawfully contrived the prices they charged commercial customers after 1987."

Even if this were so, these facts would not require a finding that these actions are time-barred. There is evidence in this record, including the Dairies' bid-rigging guilty pleas and Gustafson's price-fixing guilty plea and the factual bases therefor, from which a jury could find that the Dairies participated in a price-fixing conspiracy which resulted in a series of unlawfully high priced sales to plaintiffs over a period of years, continuing into the limitations period. Where there is evidence of the continuing nature of an agreement to eliminate competition, absent an affirmative showing of the termination of that agreement, the conspiracy must be presumed to have continued. *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 318 (4th Cir.1982). The Dairies do not point to any evidence that they reduced their artificially high prices or returned to competitive pricing prior to 1992. Therefore, whether the conspiracy continued into the limitations period by virtue of continued sales at fixed prices is a genuine question for trial.[5] Should the jury find that plaintiffs

---

[3]The district court also found that there were none, characterizing evidence of a price-fixing conversation in 1988 as "isolated and ambiguous." In weighing the evidence, the district court found a fact against plaintiffs in violation of Rule 56(c), Fed.R.Civ.P.

[4]The court, however, did not point out what this evidence was.

[5]Of course, after the development of the evidence, the jury will ultimately determine these facts.

purchased milk at fixed prices beyond 1989, even though plaintiffs could have sued in the 1970s, they were equally entitled to sue in 1993. *Hanover Shoe,* 392 U.S. at 502, 88 S.Ct. 2224.

If at trial, however, the jury finds that this conspiracy did not continue into the four-year limitations period immediately preceding July 1, 1993, when plaintiffs filed these claims, then these actions are time-barred unless the statute was tolled.

B.      *Tolling the Statute of Limitations*

Plaintiffs advance both statutory and equitable grounds for tolling the statute of limitations in this case. We consider each in turn.

1.      *Statutory Tolling*

Congress has provided for the tolling of statutes of limitations in private antitrust actions which are based in some part on prior government proceedings. 15 U.S.C. § 16(i) provides:

> (i) Suspension of limitations. Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws ... the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter.

The government commenced its antitrust proceedings against these defendants on March 1, 1990. Those proceedings concluded on August 7, 1992, when Gustafson's pled guilty to price-fixing.[6] Therefore, should it be found that the statute of limitations began to run in 1988, as the Dairies contend, if Section 16(i) applies, it tolled the statute in 1990, prior to its expiration, and these actions were timely-filed in 1993 (within one year of the termination of the last proceeding in 1992).[7]

---

[6]Defendants concede plaintiffs may tack together the periods during which the statute was tolled by the various government proceedings against each of these defendants.

[7]This issue is only relevant to plaintiffs' claims against T.G. Lee Foods, Inc., Borden, Inc., Flav-O-Rich, Inc., and the Southland Corporation. Gustafson's pled guilty to fixing commercial prices so the tolling effect of Section 16(i) is not at issue. Plaintiffs do not contend that Section 16(i) tolls the statute of limitations with respect to Pet Inc. or McArthur Dairy, Inc., both of which were not sued until 1994.

The district court held, however, that Section 16(i) does not apply. The district court based its conclusion on its observation that "[bid-rigging] is not the same violation as price-fixing," and its assumption that such a "direct correlation" between the two causes of action is required. Plaintiffs contend this was error.

Section 16(i) applies if there is a "real relationship" between the government proceeding and the subsequent private actions. *Leh v. General Petroleum Corp.,* 382 U.S. 54, 65-66, 86 S.Ct. 203, 15 L.Ed.2d 134 (1965).[8] Generally, we look for this relationship by comparing the allegations of the two complaints. *Id.* In *Leh,* the Supreme Court was asked whether Section 16(i) applies when the allegations in the subsequent private action are different with respect to time period, geographic scope, and alleged wrongdoers. The Court held that it does, minimizing those distinctions:

> The private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants. Rather, effect must be given to the broad terms of the statute itself—"based in whole or in part on any matter complained of"—read in light of Congress" belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws. Doubtlessly, care must be exercised to insure that reliance upon the government proceeding is not mere sham and that the matters complained of in the government suit bear a real relation to the private plaintiff's claim for relief.

*Id.* The Court made very clear that the courts must not allow a legitimate concern that invocation of Section 16(i) be made in good faith to lead them into a miserly or stingy construction of the statutory language. *Id.*

In a companion case, *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965), the Court extended *Leh* to hold that Section 16(i) applies to toll the limitations period during the pendency of the government proceeding even when the subsequent private plaintiff claims a different statutory violation.

Section 16(i) applies, therefore, even if, after the government proceeding, the private plaintiff alleges that the defendants used different means to achieve different objectives so long as there is a real relationship between the activities complained of in each proceeding. *Id; Leh,* 382 U.S. at 59-60, 86 S.Ct. 203. The

---

[8]It is at this point that the parties exchange positions. Plaintiffs, who argued that they didn't learn about the price-fixing because price-fixing is nothing like bid-rigging, now assert that "the link between the conspirators' school milk bid-rigging and commercial milk price-fixing is manifest." The Dairies, who contended that bid-rigging was just one form of price-fixing, and that the bid-rigging publicity notified plaintiffs that the Dairies were fixing prices, now argue that the bid-rigging charges involved "an entirely different cause of action" from the price-fixing claims.

conspiratorial acts alleged by the private plaintiff must be "intertwined with and fundamentally the same" as those alleged in the government action. *Maricopa County v. American Pipe and Const. Co.,* 303 F.Supp. 77 (D.Ariz.1969). If there is a significant, although incomplete, overlap of subject matter, the statute is tolled even as to the differences. *Leh,* 382 U.S. at 54, 86 S.Ct. 203.

The Tenth Circuit has found this standard to be met where the private action alleges similarity in proof, means of carrying out the conspiracy, and subject matter. *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561, 570 (10th Cir.1961). Section 16(i) applies, the court held, if the private plaintiffs allege substantially the same sort of conspiracy against a similar cast of characters who relied at least in part on the same means for effecting their conspiracy. *Id.* Reliance by the private plaintiff on the same documentary and oral proof to establish the conspiracy bolsters the decision that Section 16(i) applies. *Id.* Similarly, the Ninth Circuit has held that Section 16(i) applies when the private plaintiff alleges a conspiracy that includes the objectives, means, time span, and geographic scope of the conspiracy alleged in the government suit, and the evidence adduced in the government suit is of practical assistance to plaintiffs in proving their own complaint. *Chipanno v. Champion Int'l Corp.,* 702 F.2d 827, 832 (9th Cir.1983).

In this case, the private plaintiffs allege a conspiracy that is similar to the government prosecution in terms of defendants, geographical scope, and time frame. There is also a "real relationship" between the objectives of both conspiracies. In both the bid-rigging and price-fixing conspiracies, the Dairies engaged in collusive behavior designed to eliminate competition in the wholesale marketplace in Florida during the 1970s, 1980s, and possibly into the 1990s.

The only significant difference between the allegations of the government prosecution and these actions concern the means involved—bid-rigging and price-fixing. Their purpose was the same—to eliminate competition in the wholesale marketplace in Florida. In rigging their bids to school districts, the Dairies sought to divide the wholesale market to schools amongst themselves. Similarly, in fixing their prices to plaintiffs, the Dairies sought to divide the wholesale market to groceries amongst themselves. Although

bid-rigging and price-fixing are not the same means, there appears to be a "real relation" between them in the context of this case.[9]

This same conclusion was reached in a similar set of circumstances in Arizona. In that case, the federal government brought both criminal and civil actions against several Arizona dairies, including one of the defendants in this case, alleging a wholesale price-fixing conspiracy. Subsequently, the state of Arizona and a private plaintiff sued the dairies as well as several grocery stores alleging a retail price-fixing conspiracy. *In re Arizona Dairy Products Litig.,* 1984-2 CCH Trade Cases ¶ 66, 284 (D. Ariz 1984). In holding that the retail price-fixing conspiracy allegations were based in part on matters complained of by the federal government and bore a "real relation" to the prior proceeding, the court disregarded the difference in the markets. Instead, the court concluded that the conspiracy alleged by the private plaintiff was "at least in part the same conspiracy as was the object of the Government's suit." *Id.*

We too believe that these actions bear a real relation to the prior government proceedings because they are, at least, a part of the Dairies' conspiracy to avoid competition in their sales of milk in Florida during this time period. The Dairies are alleged, just as in the government's proceedings, to have eliminated competition among themselves by agreeing to divide the wholesale milk market instead of competing for it through the vehicle of price. In the government's proceedings, the Dairies eliminated price competition and divided the market by agreeing on the price of a successful bid to a school district. In these actions, they are alleged to have eliminated price competition and divided the market by agreeing on the price of milk to retailers. Accordingly, these latter price-fixing activities bear a real relationship to the prior price-fixing activities.

---

[9]The Dairies cite only two cases in support of their contention that there is no real relationship between their bid-rigging activities and their price-fixing activities. Neither case is helpful. In *Peto v. Madison Square Garden Corp.,* 384 F.2d 682, 683 (2d Cir.1967), a conspiracy to monopolize boxing was not related to a conspiracy to monopolize hockey, especially since the "only similarity between the two actions is found in the fact that some of the defendants are the same." In *Charley's Tour & Transp., Inc. v. Interisland Resorts, Ltd.,* 618 F.Supp. 84, 86 (D.Haw.1985), Section (i) did not apply because the two complaints alleged different markets, different defendants, different means of proof and "wholly different actions on the part of the defendants as the basis for establishing liability."

In addition, there may be substantial reliance by the plaintiffs on the oral and documentary proof contained in the government's cases because the Dairies' plea agreements all contain uncontradicted statements that they engaged in commercial price-fixing. These statements provide an evidentiary basis for plaintiffs' present claims.

Therefore, because these actions are based in part on the government's proceedings, both factually and in the proof on which these plaintiffs will rely, we conclude that Section 16(i) tolled the statute of limitations on plaintiffs' claims from March 1, 1990 until August 7, 1992. These claims, therefore, were timely filed.[10] Even though they timely-filed, however, plaintiffs may recover damages for only the four-year period immediately preceding the filing of their claims unless the statute was tolled for some other reason prior to that time. *Zenith,* 401 U.S. at 338, 91 S.Ct. 795. Plaintiffs assert there was another reason.

2. *Equitable Tolling by Fraudulent Concealment*

Fraudulent concealment also tolls the Clayton Act's statute of limitations. *In re Beef Indust. Litig.,* 600 F.2d at 1169. If the Dairies fraudulently concealed their price-fixing activities beginning in the 1970s, then the statute of limitations was tolled during the time of the concealment. If so, plaintiffs may recover damages for all the years during which the conspiracy was fraudulently concealed and the statute was tolled. *Id.*

To avail themselves of this doctrine, plaintiffs have the burden of proving at trial that "the defendants concealed the conduct complained of, and that [plaintiffs] failed, despite the exercise of due diligence on [their] part, to discover the facts that form the basis of [their] claim." *Id.*

On motion for summary judgment, however, the moving party always bears the initial burden of pointing out the undisputed facts which entitle it to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *In re Beef Indust. Litig.,* 600 F.2d at 1170. To be entitled to judgment on this issue, then, the Dairies must show that plaintiffs either knew

---

[10]This holding does not extend to Pet and McArthur. As to Pet's liability, see Section II. C. McArthur may be liable only on a theory of continuing conspiracy or fraudulent concealment, and then only if it was sued within four years of either the last purchase at a fixed price or plaintiffs' discovery of their claim against it.

of their claim or had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims. If the Dairies point to such facts in the record, then plaintiffs must demonstrate that these facts are in dispute. *Id.*

In determining whether there is an issue of fact for trial regarding plaintiffs claim of fraudulent concealment, we must resolve all doubt against the moving party. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. This standard is applied with particular stringency where it is claimed that the defendant's conduct prevented the plaintiff from discovering his claim prior to the expiration of the limitations period. *In re Carbon Dioxide Antitrust Litig.,* 1993-2 CCH Trade Cases ¶ 70,436 at 5 (M.D.Fla.1993).

In fact, we have held, along with a majority of the circuits, that the issue of when a plaintiff is on "notice" of his claim is a question of fact for the jury. *Ballew v. A.H. Robins Co.,* 688 F.2d 1325 (11th Cir.1982); *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985); *Lundy v. Union Carbide Corp.,* 695 F.2d 394 (9th Cir.1982); *Renfroe v. Eli Lilly & Co.,* 686 F.2d 642 (8th Cir.1982).

We have also held on numerous occasions that, as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment. *Smith v. Duff and Phelps, Inc.,* 891 F.2d 1567, 1572 (11th Cir.1990) (due diligence is jury issue); *Durham v. Business Management Assocs.,* 847 F.2d 1505, 1509 (11th Cir.1988) (factual issue of due diligence involves state of mind not resolvable by summary judgment).

In order to be entitled to judgment as a matter of law on these issues, then, the Dairies have the burden, as the moving parties, to point to undisputed facts in the record which demonstrate conclusively that plaintiffs had notice of their claims, and, that, had they exercised reasonable diligence, they would have discovered adequate grounds for filing this antitrust lawsuit during the limitations period. *In re Beef Indust. Litig.,* 600 F.2d at 1171. It is not enough for summary judgment to point to facts which *might* have caused a plaintiff to inquire, or *could* have led to evidence supporting his claim. A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment. To award summary judgment on such a showing is error.

The grant of summary judgment in this case was such an error. The district court held that the newspaper articles regarding the Dairies' bid-rigging put plaintiffs on notice in early 1988 that "defendants were accused of acting jointly to the detriment of other substantial commercial customers," and that "[h]ad the plaintiffs exercised due diligence during the statutory period, they would have discovered most, if not all, of the facts upon which they now base their claims." The Dairies, however, have shown only that there was information in 1988 that *might* have led plaintiffs to inquire, and have made virtually no showing at all regarding what plaintiffs would have discovered had they done so. This is not enough to entitle the Dairies to summary judgment.

In holding that notice of bid-rigging constituted notice to plaintiffs of possible price-fixing, the district court resolved a question of fact against them in violation of Rule 56.[11] The best the evidence can be said to show is that:

> Mr. Morton admitted that he read several articles in *The Sarasota Herald Tribune* about a lawsuit by the Attorney General accusing Defendants in this case of a vast conspiracy to [rig the bids for] milk products sold to Florida schools. These articles were published as early as February of 1988, and Morton was aware from that time forward of *problems the dairy industry was having with the authorities.*

We know of no case, however, in which information regarding one sort of antitrust violation by a defendant has been held, as a matter of law, to constitute notice of all other possible violations. The cases cited by the Dairies for this proposition are all "same violation" cases. In these cases, widely publicized earlier investigations of *exactly the same antitrust violations* were held to constitute adequate notice to others of their possible claims. For example, in the *Beef Industry Antitrust Litigation* case, the prior publicized lawsuit "involved allegations essentially identical to those of the [present lawsuit]." 600 F.2d at 1169. In *Ohio ex. rel. Montgomery v. Louis Trauth Dairy, Inc.,* 1996-1 Trade Cases ¶ 71, 396 (S.D.Ohio 1996), press reports of bid-rigging of school milk contracts in Florida put Ohio on inquiry notice regarding Ohio school

---

[11]Similarly, there are factual disputes on the issue of affirmative acts of concealment. One defendant's brief, for example, claims that there were no acts of concealment because the alleged false statements to customers regarding why milk prices were going up "were, in fact, true." This is a fact question that only a jury should resolve.

milk contracts.[12]  In *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975), widely-publicized congressional hearings concerned the very same violations sued upon after the expiration of the limitations period by Dayco.  Notice that the Dairies were rigging bids to one customer, then, supplies notice that they might be rigging bids to you and triggers a duty to inquire. *In re Beef Indust. Litig.,* 600 F.2d at 1171 ("Those who have learned of facts 'calculated to excite inquiry' must inquire").  The Dairies were not, however, selling to the plaintiffs by a bidding process.

None of these cases, however, holds that notice of one wrong by a defendant triggers a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing, and we are unwilling to say that it does as a matter of law.  Notice that sellers have come up with a method of extracting undeserved profit from the government does not, as a matter of law, supply notice to the private buyer that the sellers have come up with another method to get into his pocket.  Whether notice of rigging bids to schools for milk contracts should have excited these plaintiffs to inquire about possible price-fixing as to milk retailers is a question for the jury and may ultimately depend on credibility choices.[13]

Furthermore, even if it were undisputed that plaintiffs had notice regarding the possibility that Dairies might be fixing their prices, this does not mean that plaintiffs had either actual or constructive knowledge of their claim.

> The plaintiffs' knowledge of [circumstances which did or should have excited them to inquire] is not *as a matter of law* tantamount to actual or constructive knowledge of their claim.  Although the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it.  The filing by others of a similar lawsuit against the same defendants may *in some circumstances* suffice to give notice, but to rule that it does so as a matter of law is to

---

[12]The other cases cited by the Dairies are factually dissimilar but they also involve a plaintiff's earlier knowledge of the same wrong later sued upon. *Friedman v. Estate of Presser,* 929 F.2d 1151, 1159-60 (6th Cir.1991) (later knowledge of role of informant known to plaintiff earlier); *United Klans of America v. McGovern,* 621 F.2d 152, 154 (5th Cir.1980) (statute of limitations not tolled in action for illegal investigation where Justice Department held a press conference to announce investigation of Klan and notified Klan of investigation prior to termination of statute).

[13]We find no inconsistency between this holding and our earlier determination that the price-fixing allegations bear a "real relationship" to the prior bid-rigging allegations.  Even though there was a real relationship between the Dairies' bid-rigging activities and their price-fixing activities, the newspaper stories were not sufficient, as a matter of law, to reveal this relationship to plaintiffs.

compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights, regardless of whether his attorney believes that there is "good ground to support it." Rule 11, F.R. Civ. P. The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might well be frivolous or baseless.[14]

*In re Beef Indust. Litig.,* 600 F.2d at 1171 (citations omitted).

The Dairies "had the burden, as the moving parties, to demonstrate conclusively that the plaintiffs, through the exercise of reasonable diligence, would have discovered adequate ground for filing suit." *Id.* They did not, however, address this issue at all in their briefs. Their summary judgment motion refers us only to the newspaper articles and to the fact that plaintiffs did business with some of the individuals criminally charged with bid-rigging. They point to no evidence in this record suggesting that the bid-rigging investigations verified or even publicized any information regarding commercial price fixing prior to Gustafson's guilty plea in 1992. Neither do they point to evidence that plaintiffs had independent access before that time to any information, beyond the newspaper articles, that would have tended to verify their suspicions had they had any.[15] In similar circumstances, we have said:

> At best, the materials on file might support an inference that the plaintiffs would have discovered adequate support before [the expiration of the limitations period] had they been reasonably diligent. The inference, however, is not so compelling as to entitle the defendants to summary judgment. Because the defendants failed to demonstrate the absence of genuine issues of fact ... summary judgment must be reversed.

*In re Beef Indust. Litig.,* 600 F.2d at 1171.

---

[14]Since the publicized facts underlying the bid-rigging charges were not relevant to plaintiffs' price-fixing claims, and the court pointed to no other facts available to plaintiffs at that time, it appears that the district court's ruling was predicated on its belief that "[h]ad they filed suit at any time between February, 1988, and February, 1992, the plaintiffs could have issued subpoenas, conducted depositions, and propounded interrogatories, as they did after 1993. The plaintiffs could have then formulated the basis for their current action." Thus, the district court's suggestion in this case that plaintiffs should have "filed first and investigated later" seems contrary to Rule 11, Fed.R.Civ.P.

[15]In fact, in arguing that their denials of price-fixing to the Florida Attorney General do not amount to affirmative acts of concealment because that investigation was required by law to be secret, the Dairies assert that "the information never entered the public domain."

Dairies' position is that such evidence is unnecessary because plaintiffs conducted no investigation.[16] They contend that the doctrine of fraudulent concealment is unavailable to a plaintiff who, in fact, exercises no diligence at all.

Although there is some authority for this proposition,[17] the overwhelming weight of authority treats "inquiry notice" as an objective standard.[18] Under this standard, when defendants are guilty of concealing their anti-competitive activities, the plaintiff is not charged with knowledge of his claim until he *should have* discovered the basis for his claims. *In re Beef Indust. Litig.,* 600 F.2d at 1171 (no actual or constructive notice of claim until plaintiffs, through the exercise of reasonable diligence, would have discovered adequate ground for filing suit). *See also Great Rivers Coop. v. Farmland Industries, Inc.,* 120 F.3d 893, 896 (8th Cir.1997) ("inquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations"); *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987) (" 'storm warnings' of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner ... [and] his cause of action is deemed to accrue on the date when he should have discovered the alleged fraud").

Furthermore, the statute of limitations is tolled until this time. *Duff and Phelps,* 5 F.3d at 492 n. 9. *See also Sterlin v. Biomune Systems,* 154 F.3d 1191, 1201 (10th Cir.1998) (statute of limitations dos not begin to run until plaintiff should have discovered the facts underlying the fraud); *Law v. Medco Research, Inc.,* 113 F.3d 781, 785 (7th Cir.1997) (statute runs from time plaintiff learns of facts supporting claim).

The scope of the plaintiffs' damages, therefore, depends upon when they should have discovered the facts supporting their claims. This is true regardless of whether they actually investigated. *Marks v. CDW*

---

[16]Plaintiffs readily admit they did nothing to investigate their claims prior to the 1992 guilty plea by Gustafson's, because, they argue, they had no reason to suspect that they too had been victimized.

[17]*See Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993) ("equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud").

[18]Such a "discovery" accrual rule is commonly applied by the Circuits in securities fraud cases where the plaintiff's cause of action is held to accrue only when he reasonably should have discovered the fraud. *Klehr,* 521 U.S. at 191, 117 S.Ct. 1984.

*Computer Ctrs., Inc.,* 122 F.3d 363, 368 (7th Cir.1997). "Inquiry notice does not begin to run unless and until the investor is able, with the exercise of due diligence (*whether or nor actually exercised* ), to ascertain the information needed to file suit." *Id.* (emphasis added); *Caviness v. Derand Resources Corp.,* 983 F.2d 1295, 1303 (4th Cir.1993) (the limitations period commences "when the plaintiff knows of the facts on which the action is based or has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based"). In a price-fixing case involving some of these same defendants, the Fourth Circuit concluded that:

> [W]ith regard to the third element of [the fraudulent concealment] test, the due diligence requirement, it is possible for a plaintiff to satisfy that element without demonstrating that it engaged in any specific inquiry.... Furthermore, if reasonable further investigation would not have revealed the basis for the antitrust claim, the plaintiff's claim is not time barred. (citations omitted)

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.* 71 F.3d 119, 128 (4th Cir.1995)

The actual exercise of diligence is irrelevant because the standard is an objective one. As the Tenth Circuit recently explained:

> [A]lthough a plaintiff has an "obligation of diligence," the plaintiff need not show the actual exercise of diligence in order to "toll" the limitations period. Rather in deciding whether the statute should be tolled, it must be determined whether a "reasonably diligent plaintiff" would have discovered the fraud. (citations omitted)

*Sterlin,* 154 F.3d at 1201. *See also Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 694-95 n. 16 (10th Cir.1981) (while equity required actual diligence, modern federal test requires "hypothetical diligence"). *See also Klehr,* 521 U.S. at 195-96, 117 S.Ct. 1984 (in Civil Rico, the concealment requirement is satisfied if the plaintiff shows that he neither knew nor, in the exercise of due diligence, *could reasonably have known* of the offense).

Both the diligent and the non-diligent plaintiff are protected from the expiration of claims the factual basis for which was shrouded by the veil of fraudulent concealment. Neither, however, is protected from the expiration of claims the factual basis for which they could and should have discovered through the exercise of due diligence.[19] As the Seventh Circuit has observed:

---

[19]This objective standard accommodates the federal antitrust interest in expediting enforcement of economic competition with the federal judicial interest in avoiding groundless or premature suits. *See*

> Is mere suspicion discovery? Or, at the other extreme, must the investor have learned (or been in a position where he should have learned) all the facts he needs in order to file suit? ... [T]he plaintiff gets [the] period of the statute of limitations after he learned or should have learned the facts that he must know to know that he has a claim.

*Medco Research,* 113 F.3d at 785.

In finding that plaintiffs did not act diligently, the district court did not refer to undisputed facts which support a conclusion that a reasonable investigation would have provided plaintiffs with a basis to sue in 1989. Apparently, however, the court relied[20] upon the affidavit of Jay Gurmankin, an attorney who represented Albertson's Supermarkets. Gurmankin's first affidavit states that, prompted by news of the government investigations into bid rigging in Florida in 1988, he conducted an investigation of commercial price fixing, took two sworn statements from bid-riggers, and ultimately negotiated a settlement with one of Albertson's dairy suppliers in 1989. The district court inferred from this affidavit that, if plaintiffs had also investigated in 1988, they too could have discovered the facts which led to Albertson's settlement of their antitrust claims in 1989.

In later testimony, however, Gurmankin conceded that he did not actually take the bid-riggers' statements until 1990 and early 1991. Therefore, they could not possibly have informed Albertson's of the basis for its 1989 settlement. In fact, he acknowledged that the 1989 settlement was in connection with an antitrust lawsuit in Utah, totally unrelated to Albertson's later-discovered antitrust claims in Florida, and that the Florida claims were settled only in the summer of 1991. He also testified that the Florida settlement was achieved during a period when Albertson's was represented not only by himself, but by the same attorneys who, on behalf of the State of Florida, had conducted the investigation into the Dairies bid-rigging activities.

Reliance on these affidavits, which the district court characterized as uncontradicted, is error. They are internally inconsistent and do not establish that Albertson's learned of its Florida claims prior to 1990 or 1991. The Dairies did not, therefore, meet their burden of establishing that there is undisputed evidence in

---

*Sterlin,* 154 F.3d at 1202.

[20]The district court did rely on these affidavits for its conclusion that plaintiffs were on notice that "where there's smoke, there's fire."

this record which conclusively shows that plaintiffs could have discovered the basis for their claims in 1989, if only they had been duly diligent. The Dairies are not, therefore, entitled to summary judgment on the issue of fraudulent concealment.[21] If plaintiffs prove fraudulent concealment of price-fixing at trial, they may recover damages co-extensive with the concealment and into the limitations period.

C.      *Abandonment of the Conspiracy*

The law recognizes that a conspirator may withdraw from the conspiracy. *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). Withdrawal marks a conspirator's disavowal or abandonment of the conspiratorial agreement. *United States v. Read,* 658 F.2d 1225, 1233 (7th Cir.1981). A conspirator who withdraws from the conspiracy is no longer a member of the conspiracy and the subsequent acts of the conspirators usually do not bind him.[22] *Id. See also United States v. Borelli,* 336 F.2d 376, 388 (2d Cir.1964). The ex-conspirator remains liable, however, for his previous agreement and all damages inflicted by the acts he committed prior to his withdrawal. *Id.*

Withdrawal, therefore, is not a complete defense to the charge of conspiracy. It becomes a complete defense only when coupled with the defense of the statute of limitations. The statute of limitations begins to run upon the conspirator's withdrawal from the conspiracy. *United States v. Antar,* 53 F.3d 568, 584 (3d Cir.1995). If he is not sued within the limitations period, all claims against him are time-barred. He cannot be held liable for the acts of the other conspirators after he withdrew because his withdrawal effectively ended his membership in the conspiracy.[23] Nor can he be sued for the damages caused by his previous participation because the limitations period has elapsed. Thus, the interaction of the two defenses of withdrawal and statute of limitations operates to shield the ex-conspirator of all liability. *Read,* 658 F.2d at 1233.

---

[21]Of course, the jury will ultimately determine what these plaintiffs should have known and when they should have known it.

[22]The exception is where a continuing conspiracy is alleged. Since a continuing conspiracy is alleged as one crime, a conspirator is still liable for the crimes of his co-conspirators even after his withdrawal, so long as he is sued during the limitations period.

[23]The continuing conspiracy is the exception.

Pet and Southland sold their dairies in 1985 and 1988 respectively. They contend that these sales constituted an abandonment of the alleged price-fixing conspiracy. If so, the statute of limitations began to run as to plaintiffs' claims against them in 1985 and 1988. We have already decided that Section 16(i) tolled the statute in 1990. Plaintiffs, therefore, timely filed as to Southland. Even if it withdrew in 1988, it remains liable to plaintiffs since they filed during the limitations period. If Pet withdrew in 1985, however, these actions would not be timely filed.[24]

The standard for effective withdrawal has been articulated by the Supreme Court:

> Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment.

*United States v. U.S. Gypsum Co.,* 438 U.S. 422, 464-65, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Although mere cessation of activity is not sufficient to establish withdrawal, *United States v. Hogan,* 986 F.2d 1364, 1375 (11th Cir.1993), a conspirator may avoid further liability for his actions if he affirmatively and completely disassociates himself from the continued operation of the conspiracy. *United States v. Lowell,* 649 F.2d 950, 955 (3d Cir.1981).

In this circuit, however, it has long been necessary that the conspirator demonstrate that he "undertook affirmative steps, inconsistent with the objects of the conspiracy, to *disavow or to defeat* the conspiratorial objectives." *United States v. Finestone,* 816 F.2d 583 589 (11th Cir.1987) (emphasis added). "Merely ending one's activity in a conspiracy may not constitute withdrawal." *United States v. Pippin,* 903 F.2d 1478, 1481 (11th Cir.1990) (citing *Finestone, id.*). The defense of withdrawal is not available to one who merely ceases to participate and does not *affirmatively* withdraw. *United States v. Young,* 39 F.3d 1561, 1571 (11th Cir.1994); *United States v. Hogan,* 986 F.2d 1364, 1375 (11th Cir.1993); *United States v. LeQuire,* 943 F.2d 1554, 1564 (11th Cir.1991).

---

[24]These actions may also be timely-filed against both Pet and Southland on a theory of fraudulent concealment. Under this theory, they would be liable for all damages inflicted by the conspiracy so long as plaintiffs timely filed after they discovered or should have discovered their claims.

Pet asserts that its exit from the dairy business constituted an affirmative step sufficient to effectively withdraw it from the conspiracy, and that this act was communicated to the other Dairies by the extensive publicity regarding the sale at the time. Plaintiffs contend that Pet did nothing more than cease its participation in the conspiracy and did nothing to disavow or defeat the purposes of the conspiracy. Furthermore, they contend that Pet did not communicate its withdrawal to the other conspirators.

There is merit to plaintiffs' contentions. The sale of Pet's dairy was not a disavowal of the conspiracy so much as a business decision not to produce milk anymore. Nor did it do anything to defeat the continuation of the other dairies price-fixing.[25] It simply sold its dairy and walked away.

Plaintiffs argue that we should adopt the time-bomb theory of conspiratorial liability. This theory holds that, having set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however, definitively, to participate.

> Such cessation may or may not be effective withdrawal in a lay sense, but this is one of those places where the law uses a word in a special sense. You do not absolve yourself of guilt of bombing by walking away from the ticking bomb. And similarly the law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation.

*United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989).

In an alleged price-fixing conspiracy such as this one, the requirement for affirmative steps to defeat the objectives of the conspiracy is especially relevant. Once prices have been set at an artificially high level, no further action by the conspirators is required to effect the objectives of the conspiracy. In such a continuing conspiracy, each sale at the fixed price continues to benefit the conspirators, regardless of whether some members of the conspiracy drop out.

The issue, then, is whether Pet's sale of its dairy, without more, effectively withdrew it from the milk price-fixing conspiracy, or whether some further affirmative step was required to end its liability.

In the context of a business conspiracy, one in which the conspiracy is carried out through the regular activities of an otherwise legitimate business enterprise, the law has given effect to a conspirator's

---

[25]In fact, as we have noted above, plaintiffs allege that Pet left in place the principal conspirators who continued to fix milk prices for the new owners.

abandonment of the conspiracy only where the conspirator can demonstrate that he retired from the business, severed all ties to the business, and deprived the remaining conspirator group of the services which he provided to the conspiracy. *Lowell,* 649 F.2d at 955. Resignation from the conspiring business has frequently been held to constitute effective withdrawal. *United States v. Nerlinger,* 862 F.2d 967, 974 (2d Cir.1988). A conspirator "unquestionably disavow[s] the conspiracy" to fraudulently divert the proceeds of customers' stock trades when he resigns his employment and closes the illicit account. *Id.* Similarly, an employee of a corporation involved in bribery conspiracy effectively withdrew from conspiracy when he resigned and permanently severed his employment relationship with the corporation. *United States v. Steele,* 685 F.2d 793 (3d Cir.1982).

The conspirator's break with the other conspirators, however, must be both clean and permanent. *United States v. Pippin,* 903 F.2d 1478 (11th Cir.1990). For example, a Borden manager involved in the same school milk bid-rigging conspiracy involved in this case, told the other dairies he would no longer participate in that conspiracy, but, nonetheless, honored the prior agreement not to bid for the school milk contracts that remained. *Id.* at 1481. We held that these actions did not constitute an effective withdrawal. *Id.* at 1482. *See also United States v. Eisen,* 974 F.2d 246, 269 (2d Cir.1992) (attorney who, despite resigning from the conspiratorial enterprise, continued to be entitled to a percentage of the conspiratorial proceeds did not effectively withdraw).

In order to effectively withdraw, however, it is not necessary for the conspirator to disclose the illegal scheme to the authorities. *Gypsum,* 438 U.S. at 464-65, 98 S.Ct. 2864.[26] Nor is it necessary that the conspirator notify each co-conspirator of the abandonment. *Nerlinger,* 862 F.2d at 974 ("nothing in *Borelli* or any other case requires the hiring of a calligrapher to print formal notices of withdrawal to be served upon co-conspirators").

Did Pet effectively withdraw? With the sale of its dairy, Pet certainly "retired" and totally severed its ties to the milk price-fixing conspiracy. It did nothing more to assist or participate in the price-fixing

---

[26]Such a requirement would militate against withdrawal in some cases, thereby undermining the mitigation of danger to society which the defense is designed to encourage.

activities of the other dairies. This retirement was communicated to the other dairies by the media. They knew that from that time on, Pet would not lend its services to the conspiracy. Thus, the purposes of the conspiracy were defeated at least as to Pet. We conclude, therefore, that Pet did effectively withdraw from the price-fixing conspiracy upon the sale of its dairy.

### III.

We hold that 15 U.S.C. § 16(i) tolled the statute of limitations prior to its expiration and thereafter plaintiffs timely filed these actions as to all defendants except Pet and McArthur. As to Pet, we hold that it effectively withdrew from the conspiracy in 1985 and, as to it, these actions are not timely-filed. McArthur may be liable only on a theory of continuing conspiracy or fraudulent concealment. As to damages, we hold that there remain genuine issues of material fact as to whether defendants fraudulently concealed their price-fixing activities, thereby tolling the statute at an earlier date and expanding the limitations period. Therefore, defendants are not entitled to summary judgment on this issue.

Accordingly, we AFFIRM IN PART, REVERSE IN PART and REMAND.