SOUTHWIRE COMPANY, Gaston Copper Recycling Corporation, ASARCO Inc., Kennecott Utah Copper Corp., Leviton Manufacturing Co., Inc., American Insulated Wire Corporation, Essex Electric, Inc., Mueller Copper Tube Co., Inc., Mueller Copper Tube Products, Inc., and Superior Telecom, Inc., Plaintiffs,

v.

J.P. MORGAN CHASE & CO., as successor to J.P. Morgan & Co., Inc.; and Morgan Guaranty Trust Company of New York, Defendants.

MDL No. 1303.
Nos. 02–C–707–C, 03–C–314–C, 03–C–316–C, 03–C–317–C, 03–C–318–C, 03–C–368–C.

United States District Court,
W.D. Wisconsin.

March 3, 2004.

See, also, 2004 WL 67470.

Jon P. Axelrod, Dewitt, Ross & Stevens, Madison, WI, Sanford P. Dumain, Milberg,

Weiss, Bershad & Hynes, New York City, Reginald R. Smith, King & Spalding, Houston, TX, William R. Steinmetz, Reinhart, Boerner, Van Deuren, Milwaukee, WI, James H. Bratton, Jr., Smith, Gambrell & Russell, LLP, Atlanta, GA, Bryan Nowicki, Reinhardt, Boerner, Vanduren, Madison, WI, Mark A. Glick, Parsons, Behle & Latimer, Salt Lake City, UT, Stanley M. Grossman, Pomerantz, Haudek, Block Grossman & New York City, David H. Weinstein, Weinstein, Kitchenoff, Scarlato, Karon, Philadelphia, PA, Arthur M. Kaplan, Fine, Kaplan & Black, Philadelphia, PA, for Plaintiffs.

Peter Haveles, Jr., Cadwalader, Wickersham & Taft, New York City, William M. Conley, Foley & Lardner, Madison, WI, John F. Cambria, Salans, Hertzfeld & Heilbronn, New York City, David R. Cross, Quarles & Brady, Milwaukee, WI, James H.R. Windels, Davis, Polk & Wardwell, New York City, for Defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

These antitrust actions were brought at various times by certain purchasers of copper under Section 4 of the Clayton Act, 15 U.S.C. § 16 and the Sherman Act, 15 U.S.C. § 1, against defendants J.P. Morgan Chase & Co., and Morgan Guaranty Trust Company of New York, alleging defendants' involvement in copper market manipulation in the early to mid–1990s. The cases are before the court on defendants' motions for summary judgment on statute of limitations grounds.

Earlier in this case, on July 1, 2003, defendants moved to dismiss the first amended complaint of plaintiffs Southwire and Gaston Copper, arguing that these plaintiffs had waited too long to bring their suit. On August 19, 2003, I converted defendants' motion to dismiss on statute of limitations grounds into one for summary judgment because it was not clear as a matter of law whether, as plaintiffs claimed, the statute had been tolled for periods of time that would have made the suit timely. On November 18, 2003, defendants moved for summary judgment on statute of limitations grounds against plaintiffs ASARCO, Kennecott, Leviton, American Insulated Wire, Essex Electric, Mueller Company, Mueller Products and Superior TeleCom.

Plaintiffs Southwire and Gaston Copper have moved for a continuance on the converted motion for summary judgment under Fed.R.Civ.P. 56(f). However, they have not shown that a continuance is necessary to allow them to obtain additional evidence that defendants concealed their involvement in the market manipulation. They have failed to explain how any additional evidence would change the disposition of defendants' motions.

Because both sets of plaintiffs make similar arguments and propose similar facts in opposing the motions for summary judgment, I am considering both motions in this opinion. I find that the claims of all plaintiffs accrued and the statute of limitations began to run as of July 23, 1996, when plaintiffs had notice of facts that in the exercise of reasonable diligence would have led them to actual knowledge of defendants' alleged wrongdoing. Given the increasing indications of defendants' involvement in the copper market manipulation in the ensuing four years and the liberal pleading standards under Fed. R.Civ.P. 8(a), plaintiffs had ample time to file their lawsuits against defendants before the statute of limitations ran. Certainly they had sufficient information as of August 13, 1999, eleven months before the statute ran, when the parties in another case rising out of the same alleged copper market manipulation, *In re Sumitomo Copper Litigation*, unsealed their complaint against defendants. Defendants'

confidentiality agreements, media policy and refusal to participate in a congressional hearing are not the type of obstructive behaviors that warrant estopping defendants from pleading the statute of limitations defense.

Plaintiffs are not entitled to tolling on the basis of state court class action suits (*Heliotrope General, Inc. v. Sumitomo Corp.*, Case No. GIC 701679 and *Heliotrope General, Inc. v. Credit Lyonnais Rouse, Ltd.*, Case No. GIC 749280 (*"Heliotrope II"*)) because these cases did not involve the same causes of action as those alleged in plaintiffs' present cases against defendants. Although *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir.2000) provides a basis for tolling because the *Loeb* plaintiffs alleged the same federal antitrust causes of action as the plaintiffs are alleging in this action, *Loeb* tolled the statute of limitations for only seven months and 25 days. Even if I assume that the tolling agreements entered into by defendants and plaintiffs in the *In re Sumitomo Copper Litigation* tolled the statute of limitations in the present action, the total tolling period would be insufficient to defeat defendants' motions for summary judgment on statute of limitations grounds, even after adding the tolling effect of *Loeb*. Therefore, I will grant defendants' motions for summary judgment.

None of the parties proposed background facts about certain entities involved in the copper scandal, such as Sumitomo Corporation and Yasuo Hamanaka. For the purpose of deciding these motions, I have taken certain background information from plaintiffs' complaint and previous orders and treated the information as undisputed. This is not to say that the parties would not be responsible for proving these facts at trial. From the proposed findings of fact and the record, the following facts are material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Each of these plaintiffs is a first purchaser of copper cathode and copper rod: 1) ASARCO Inc., a New Jersey corporation, with offices in Phoenix, Arizona; 2) Kennecott Utah Copper Corporation, a Delaware corporation, with offices in Bingham County, Utah; 3) Leviton Manufacturing Co., Inc., a Delaware corporation, with offices in Little Neck, New York; 4) American Insulated Wire Corporation, a Rhode Island corporation, with offices in Pawtucket, Rhode Island; 5) Essex Electric, Inc., a Delaware corporation, with offices in Fort Wayne, Indiana; 6) Mueller Copper Tube Company, Inc., a Delaware corporation, with offices in Memphis, Tennessee; 7) Mueller Copper Tube Products, Inc., a Delaware corporation, with offices in Memphis, Tennessee; and 8) Superior TeleCom, Inc., a Delaware Corporation, with offices in East Rutherford, New Jersey.

Plaintiff Southwire Company manufactures and distributes electrical quality copper rod, wire and cable in interstate and foreign commerce, directly and through its subsidiaries. Plaintiff Gaston Copper Recycling Corporation is a wholly owned subsidiary of plaintiff Southwire, engaged in the same activities as its parent.

Defendants J.P. Morgan Chase & Co. and Morgan Guaranty Trust Company of New York are corporations organized under the laws of Delaware, with offices in New York, New York. Defendant J.P. Morgan Chase & Co. is the merged successor of J.P. Morgan & Co., Inc. Defendant Morgan Guaranty Trust Company of New York is a wholly owned subsidiary of J.P. Morgan Chase & Co.

Sumitomo Corporation is a Japanese corporation that allegedly entered into contracts or agreements with respect to

physical copper and copper futures or options in order to raise, fix, stabilize and maintain the price of copper at artificially high levels. Yasuo Hamanaka is a citizen of Japan and at material times was Sumitomo's chief copper trader, holding the position of general manager of the company's copper trading operations from August 1987 until about June 13, 1996.

### B. *The Copper Scandal*

As early as December 6, 1991, *The New York Times* was reporting an artificially tight supply situation on the London copper market that had led the London Metals Exchange to "place limits on the price premium paid for the nearest delivery month over the succeeding month, in order to defuse what some traders viewed as an attempted supply squeeze." The report said that Sumitomo denied that it had been hoarding copper supplies.

On October 20, 1993, the *Financial Times (London)* reported that Credit Lyonnaise Rouse had apologized to the LME for its part in a copper squeeze on the exchange and had paid £100,000 toward the exchange's costs. The reporter noted that Credit Lyonnaise's clients included Sumitomo Corporation and that some traders had pointed to Sumitomo as the party responsible for the squeeze.

On June 13, 1996, Sumitomo publicly announced losses incurred by Hamanaka. On June 15 and 16, 1996, *The New York Times* published articles about Yasuo Hamanaka and Sumitomo and alleged unauthorized trading over a ten-year period that had caused Sumitomo to lose $1.8 billion. Neither of the articles mentioned defendants. On June 17, 1996, the paper published an article in its late edition in Section D, page 4, col. 1, entitled "With Sumitomo Loss, U.S. Widens Commodities Inquiry." In the body of the article, the reporter stated that the Commodity Futures Trading Commission was investigating ties between defendant Sumitomo and

Global Minerals and Metals Corporation, that authorities were trying to determine who might have helped Yasuo Hamanaka arrange fictitious trades and that J.P. Morgan was one of the institutions that took an active part in "those transactions." The article was unclear whether "those transactions" referred to hedging transactions by several major copper producers to protect themselves against falling copper prices or to contracts that Morgan had entered into with some copper producers as part of their business activity in the commodities market.

On July 23, 1996, the Associated Press issued a release reporting the investigation of J.P. Morgan and other banks by the Commodities Futures Trading Commission in connection with the financing of "gigantic copper trades by former Sumitomo Corp. trader Yasuo Hamanaka." According to the release, the commission was looking at loan agreements known as "copper swaps" and J.P. Morgan's swap amounted to about $400 million. The article defined "swaps" as "a type of financial agreement broadly known as derivatives, which are based on, or 'derived' from, the value of an underlying asset, such as stocks, bonds or commodities."

On July 23, 1996, *The Wall Street Journal* published an article entitled "CFTC Probes Unusual Loans to Sumitomo— Complex Copper Swaps May Have Financed Hamanaka's Purchases." The reporters stated that investigators were focusing on the possibility that Hamanaka had used millions of dollars in loans from American banks in an attempt to manipulate the copper market or mask his trading losses and that "[d]etails of the unusually structured loans, which may exceed $1 billion, have raised eyebrows in commodities markets and with U.S. and British regulators since they were disclosed in *The Wall Street Journal* last week." They

quoted a "commodity-derivatives specialist at one firm not involved in the loans" as saying that "[t]his is the strangest kind of commodity derivative I've ever seen. It should have made people [at the banks] ask what [Hamanaka] was trying to do."

On September 20, 1996, *The New York Times* published an article entitled "Sumitomo Increases Size of Copper–Trade Loss to $2.6 Billion," stating that "[s]everal American banks, including Chase Manhattan and J.P. Morgan & Company, lent nearly $1 billion in total to Sumitomo's copper-trading operations" and that the Commodities Futures Trading Commission was working with the Federal Reserve and the Treasury Department to review the role of American banks in helping to finance Sumitomo's copper dealings.

On November 22, 1996, the *Financial Times (London)* published an article entitled "Questions of Management," revealing that Sumitomo had arranged two large and complex copper swaps with J.P. Morgan and Chase Manhattan that had generated up to $900 million in up-front loans to support Sumitomo's trading activities.

On April 4, 1997, the *Financial Times (London)* published an article entitled "JP Morgan Rapped over Hamanaka Link," in which it reported that J.P. Morgan had been censured by American bank regulators for its handling of its relationship with Sumitomo Corporation and that its president had signed a memorandum of understanding issued by the New York Federal Reserve. The reporter explained that "[a] memorandum of understanding is one action open to U.S. regulators when banks fail to meet their criteria of safety and soundness." The reporter added that it was not clear why J.P. Morgan was censured and other banks were not and that the criticism might relate to controls over trading rather than the loan to Sumitomo.

Three days later, on April 7, 1997, *The Wall Street Journal* reported that federal and state banking regulators had reprimanded J.P. Morgan for lax management and controls in its base-metals business. Discussing the fact that J.P. Morgan was the only bank disciplined, the reporter speculated that one factor for the discipline might be the bank's "much deeper relationship" with Sumitomo,

> including an extensive business trading copper options with the Japanese firm. Indeed, several market participants speculate that J.P. Morgan may have financed Mr. Hamanaka's transactions in part by buying out options from Sumitomo, which are essentially a bet that the price of copper will fall, even as Sumitomo was hoarding enough copper to ensure that the metal's price remained high.

He added that J.P. Morgan had dismissed several employees and lost others, who had left voluntarily.

Earlier, on April 4, 1997, *The Guardian (London)* had reported that J.P. Morgan had been reprimanded for its role in the Sumitomo copper trading scandal. It explained that both J.P. Morgan and Chase had structured their loans to Hamanaka as complex derivative transactions, "apparently allowing Mr. Hamanaka to account for them as copper trades rather than standard loans."

Also on April 4, 1997, *American Metal Market* published an article repeating the speculation that J.P. Morgan had been disciplined because it had engaged in extensive copper trading with Sumitomo.

C.  *Defendants' Response to the Scandal*

In response to the press coverage of the copper scandal, defendants quickly implemented their media strategy, which was to "minimize mention of J.P. Morgan in continuing coverage" because defendants thought that it was the right approach to

not "inflame coverage that mentioned J.P. Morgan in the context of what was clearly becoming a scandal at Sumitomo." Defendants instructed their analysts not to comment on any speculative losses that might have been incurred as a result of the volatility in the copper market at that time. Defendants' policy was to minimize the spread of rumors about themselves. When defendants commented publicly, they stated that they had done nothing inappropriate with respect to loans to Sumitomo. In a July 5, 1996 interview on National Public Radio, defendants' chief economist, Yesper Cole, defended Sumitomo as not necessarily having broken any laws regarding its 1993 purchases of copper that were being questioned as possibly price manipulative.

Defendants were the subject of several regulatory and governmental investigations. In 1996, during the investigations, John Fullerton, defendants' Managing Director, Global Commodities, stated to examiners of the Federal Reserve Bank and New York State Banking Department that defendants had had no suspicion about Hamanaka's dealings and that they considered Sumitomo a reliable counterparty as a global player in the base metals market. Fullerton stated also that defendants never had a concern that a March 1996 trade with Sumitomo was unauthorized. Defendants sought confidential treatment for documents produced to regulators.

Susan Phillips, a governor of the Federal Reserve Bank of New York, testified at a hearing by the House Committee on Banking and Financial Services on September 18, 1996, that the Federal Reserve's investigation had not revealed any wrongdoing by defendants. Then–Congressman Charles Schumer stated at the hearing that defendants "just couldn't tell what was going on [at Sumitomo.]" Defendants declined an invitation to appear at the congressional hearing related to the Sumitomo copper scandal in 1996.

On December 11, 1996, as the result of one of the investigations by the Federal Reserve Bank and New York State Banking Department, defendants entered into a memorandum of understanding with the investigators in which defendants agreed to improve their internal controls in many areas of their businesses, including copper trading. The existence and contents of the memorandum of understanding were kept confidential. However, the Federal Reserve Board of Governors "authorized limited production of privileged information, subject to appropriate safeguards, in other evidently related litigation." The Federal Reserve produced the memorandum of understanding, as well as additional materials including interview notes taken by Federal Reserve examiners, in several cases with defendants' consent. In a related action, the Federal Reserve wrote counsel for plaintiffs ASARCO, Essex, Kennecott, Leviton, American, Mueller Company, Mueller Products and Superior on December 17, 1997, that under the amended rules, defendants could produce their business documents directly to plaintiffs' counsel.

On April 2, 1997, Steve Frank, a reporter for *The Wall Street Journal*, called defendants about an article to be published the next day about defendants' having been required to sign the memorandum of understanding "for lax oversight and management of its base metal business related to Sumitomo ... [and] that this led to the closing of [defendants'] base metals business." That same day, defendants' head of media relations in London, Joe Evangelisti, advised Frank that defendants' change in their base metals strategy was a business decision, not a result of any regulatory action. He stated that defendants did not close down the base metals business,

but that it was defendants' standard practice to continuously improve. Evangelisti kept notes in his notebook of his conversation with Frank, but destroyed that notebook. Defendants had a record retention policy, prohibiting employees from destroying records when litigation or official investigation related to those records is imminent or pending. Defendants did not ask Evangelisti to preserve records concerning his involvement with issues surrounding the copper scandal.

In 1996, the London Metals Exchange conducted an investigation of the copper market manipulation, in the course of which it asked J.P. Morgan Securities Ltd., an entity related to defendant J.P. Morgan, about certain customers of defendant. J.P. Morgan Securities Ltd. refused to tell the investigators anything more than that defendant J.P. Morgan Guaranty was the "ultimate position holder" with respect to the account held at J.P. Morgan Securities Ltd.

On November 23, 1998, Keith Murphy, an employee of defendants, entered into a separation agreement with defendants. The agreement prohibited Murphy from directly or indirectly using or disclosing, without written consent, any privileged, confidential or proprietary business information relating to the business, affairs, clients, customers, business partners, plans, proposals, finances or financial condition of defendants that Murphy received as a result of his employment with defendants. All of defendants' employees certify on an annual basis that, should they leave defendants' employment, they agree to maintain confidentiality with regard to information learned during the course of their employment and agree to notify defendants if they receive a subpoena and to give defendants an opportunity to object before they provide information in response to the subpoena.

On August 11, 1999, *The Wall Street Journal* published an article entitled "Sumitomo Sues J.P. Morgan and Unit Over Losses in Copper–Trading Scandal." A similar article appeared the next day in *American Metals Market*. Before the publication of these two articles, Evangelisti made the following affirmative statements to reporters for such publications:

- The suit [by Sumitomo against J.P. Morgan is] baseless and unsupported by the facts;
- We thoroughly investigated our conduct in this matter and are confident that we acted appropriately;
- Please don't fall into Sumitomo's trap of embarrassing us in the press so we have to settle this thing;
- Three years after the fact Sumitomo is attempting to shift the blame to its counterparts [J.P. Morgan] for its own employees' improprieties that Sumitomo's management claimed it did not detect.

### D. *Other Lawsuits*

The press coverage of Sumitomo's copper trading spawned numerous lawsuits, including:

- *Westfried v. Sumitomo Corp.*, No. 96–CV–4800 (S.D.N.Y.1996) (consolidated with *In re Sumitomo Copper Litigation* on October 28, 1996)
- *Zuccarelli v. Sumitomo Corp.*, No. 96–CV–4940 (S.D.N.Y.1996) (consolidated with *In re Sumitomo Copper Litigation* on October 28, 1996)
- *Carney v. Sumitomo Corp.*, No. 96–CV–5013 (S.D.N.Y.1996) (consolidated with *In re Sumitomo Copper Litigation* on October 28, 1996)
- *Heliotrope General, Inc. v. Sumitomo Corp.*, No. GIC 701679 (Cal.Sup.Ct. 1996)

- *R.W. Strang Mechanical v. Sumitomo Corp.*, No. GIC 701680 (Cal.Sup.Ct. 1996).

The plaintiffs in *Heliotrope General, Inc. v. Sumitomo Corp.* filed their lawsuit on July 8, 1996, as a class action, asserting state law claims on behalf of businesses who "purchased copper-based products and paid prices for such copper-based products that were inflated due to defendants' manipulations and unlawful actions." The *Heliotrope* plaintiffs did not name defendants as parties in their original complaint. As purchasers of copper-based products, plaintiffs participated as putative class members in the *Heliotrope* action. In August 1997, counsel for the named plaintiffs in *Heliotrope* served a subpoena on defendants. Defendants entered into a confidentiality agreement in *Heliotrope* and stamped every document as confidential, prohibiting the production of documents to putative class members. On October 10, 1997, the Superior Court of California denied the motion for class certification in *Heliotrope*. On February 14, 2000, the plaintiff in *Heliotrope* amended the complaint, substituting "J.P. Morgan & Company, Inc." and "Morgan Guaranty Trust Company of New York" for two of the John Doe defendants previously named in the action.

On June 5, 2000, the *Heliotrope* plaintiffs filed a new action in the San Diego Superior Court, titled *Heliotrope General, Inc. v. Credit Lyonnais Rouse, Ltd.*, Case No. GIC 749280 ("Heliotrope II"). Defendants were among the named defendants in this action. The *Heliotrope II* complaint alleged a violation of state law claims in relation to copper market manipulations. On January 22, 2003, the court certified the *Heliotrope II* class, of which plaintiffs were members. Plaintiffs ASARCO, Essex, Kennecott, Leviton, American, Mueller Company, Mueller Products and Superior opted out of the *Heliotrope*

*II* litigation on March 21, 2003, except that plaintiff ASARCO's opt-out was not effective until the *Heliotrope II* court accepted it on June 23, 2003. Plaintiff Southwire requested exclusion from the *Heliotrope II* class on March 22, 2003.

On May 8, 2000, *Loeb Industries, Inc., v. J.P. Morgan & Co., Inc.*, 00–C–274–C (W.D.Wis.2000) was filed. Plaintiffs were putative class members of the *Loeb* action, which asserted federal antitrust claims under the Sherman Act. The class allegations in *Loeb* and the allegations made by plaintiff Southwire in the present action concern the same evidence, memories and witnesses and the same federal antitrust law violations. On January 2, 2001, this court dismissed *Loeb* with prejudice. The *Loeb* plaintiffs appealed the dismissal; the Court of Appeals for the Seventh Circuit upheld it in an opinion issued on September 20, 2002. *See Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002).

In addition to the *Heliotrope* and *Loeb* litigation, the following suits were filed against defendants before July 23, 2000:

- *R.W. Strang Mechanical v. Sumitomo Corp.*, No. 701680 (Cal.Sup.Ct.1996) (complaint amended to add defendant J.P. Morgan on February 14, 2000)

- *National Metals, Inc. v. Sumitomo Corp.*, No. 734001 (Cal.Sup.Ct.1999) (complaint amended to add defendant J.P. Morgan on February 14, 2000)

- *Ocean View Capital, Inc. v. J.P. Morgan & Co., Inc.*, No. 00–CV–3756 (S.D.N.Y.2000) (filed May 17, 2000).

Beginning on September 3, 1997, defendants executed a series of "standstill and tolling" agreements with the plaintiffs in *In re Sumitomo Copper Litigation*, none of whom are plaintiffs in this case. The plaintiffs in *Sumitomo* agreed not to assert any claim or cause of action against

defendants arising out of or relating to the events and transactions alleged in the action during the period from September 3, 1997 through October 2, 1998, and from March 2, 1999 through June 11, 1999.

In addition, on September 28, 1999, defendants required the plaintiffs in *In re Sumitomo Copper Litigation* to agree to confidentiality limitations before defendants would respond to the subpoena that had been served on it. The confidentiality agreement prohibited the plaintiffs from disclosing materials obtained from the New York State Banking Department, such as the memorandum of understanding, to any defendant that had settled or was in the process of settling the *In re Sumitomo Copper Litigation* case. The agreement restricted the plaintiffs' use of such document to pursuing possible claims against J.P. Morgan only. On June 15, 1999, the *Sumitomo* plaintiffs filed an amended complaint under seal against defendants, which remained under seal until March 22, 2001.

Defendants executed a series of "standstill and tolling" agreements with Sumitomo, beginning on March 22, 1999, under which Sumitomo agreed not to assert its claim against defendants until the expiration of the standstill period and all parties agreed that their discussions would remain confidential. On August 11, 1999, Sumitomo filed suit against defendants under seal. On August 13, 1999, the parties unsealed the complaint.

Almost four years later, on June 13, 2003, plaintiffs ASARCO, Essex, Kennecott, Leviton, American Insulated Wire, Mueller Company and Mueller Products filed their antitrust complaints against defendants. Plaintiff Superior filed its antitrust complaint about one month later on July 11, 2003. Plaintiff Southwire filed its original complaint in the present action on December 30, 2002 and filed its first amended complaint on April 25, 2003, adding plaintiff Gaston Copper and making the same allegations as in the original complaint. All plaintiffs seek damages for violations under section 4 of the Clayton Act, 15 U.S.C. § 16, and section 1 of the Sherman Act, 15 U.S.C. § 1; plaintiffs Southwire and Gaston Copper also seek damages for violations under RICO, 18 U.S.C. § § 1962(c) and 1962(d). From July 23, 1996 to August 1999, plaintiffs ASARCO, Essex, Kennecott, Leviton, American, Mueller Company, Mueller Products and Superior took no actions to discover grounds for suits against defendants other than reviewing periodicals, reading major mainstream publications as well as metals industry specific publications as part of their business and monitoring class action lawsuits. During this same period, plaintiffs Southwire and Gaston Copper followed "copper market information," including news reports of ongoing litigation related to the copper market and reviewed industry specific periodicals.

## OPINION

Antitrust claims such as plaintiffs' are subject to a four-year statute of limitations. 15 U.S.C. § 15b (requiring plaintiff to bring antitrust action "within four years after the cause of action accrued"); *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (analogizing RICO to Clayton Act violations and therefore imposing a four-year limitations period for private civil claims under RICO). About the length of the limitations period, the parties are in agreement. On such matters as when the four-year period starts to run, what criteria the court should use to determine the starting date, the applicability of various tolling doctrines and their effect on this case, they part company.

Plaintiffs contend that the court can find that they brought their suits within the statutory period on any one of a number of grounds. First, the statute did not begin to run (that is, plaintiffs' cause of action did not *accrue)* before August 1999 because it was not until then that plaintiffs had ready access to sufficient information to bring a claim against defendants. Second, even if the statute began to run before August 1999, defendants prevented plaintiffs from filing on time by fraudulently concealing essential information for filing a lawsuit until August 1999. Third, even if one applies the July 23, 1996 accrual date that the court held to be the date of accrual in its August 19, 2003 order denying defendants' motion to dismiss, the *Heliotrope* and *Loeb* class action lawsuits tolled the statute of limitations so as to make the present actions timely. Fourth, when the standstill tolling agreements entered into by defendants are added to the tolling effect of the *Heliotrope* and *Loeb* class actions lawsuits, the total is sufficient to make the filing timely. I will start by deciding when the statute began to run, an inquiry that encompasses plaintiffs' first and second arguments.

## A. *When Statute of Limitations Begins to Run*

■ The statute of limitations starts running as of the accrual date. 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action *accrued.'* ") (Emphasis added.) The general rule is that a cause of action accrues when the defendant commits an act that injures the plaintiff's business, which is a workable rule when the act is obvious. What if it is not? In this situation, some courts determine the accrual date by applying the discovery rule that is read into statutes of limitations in

most federal question cases, *e.g., Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir.1990) (noting that in federal question cases, courts apply rule that cause of action does not accrue until date on which plaintiff discovers that he has been injured). Others look at the question through a slightly different prism, holding that the statute does not start to run while the defendant's offense is "fraudulently concealed," 2 Philip E. Areeda, et al., *Antitrust Law,* ¶ 320 at 231–31 (2d ed. 2000) ("The general doctrine that the statute of limitation does not run while the defendant's offense is 'fraudulently concealed' has been adopted in antitrust litigation."). Whether these differences in approach are legally significant is unclear and possibly irrelevant, since in antitrust cases at least, a plaintiff cannot rely on either an undiscovered or fraudulently concealed accrual date unless he can demonstrate that he exercised reasonable diligence to uncover the allegedly unlawful activity. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 195–96, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (" 'The concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.' ")(quoting 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338, at 145 (rev. ed.1995)).

But what does it mean to "know" of an offense? How much does an injured party have to know to "discover" his injury or to allow a court to find that the defendant's efforts to conceal the illegal acts have ended? In the August 19, 2003 opinion and order, dkt. # 504, in which I denied defendants' motion to dismiss on statute of limitations grounds and converted defendants' motion to one for summary judgment, I concluded that plaintiffs' cause of action accrued on July 23, 1996, when the Associated Press reported a Commodities Futures Trading Commission investigation

into J.P. Morgan and other banks in connection with the Sumitomo copper trades. At this point, I found, plaintiffs had enough information to trigger their obligation to make further inquiry. *Singletary v. Continental Illinois National Bank*, 9 F.3d 1236, 1243 (7th Cir.1993) (reasonable person knowing that local bank officer had worked with officer at Continental Bank to get phony loan "booked" at bank "would have begun to investigate to see whether [he] would have a cause of action against Continental, the logical deep-pocket defendant"); *Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir.1988) (holding that limitations period begins to run when plaintiff " 'has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge' ") (quoting *Vigman v. Community Nat'l Bank & Trust Co.*, 635 F.2d 455, 459–60 (5th Cir.1981)); *Pinney Dock and Tranport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1480 (6th Cir.1988) (once plaintiff's employee reached point at which he knew that defendants were "acting jointly to [plaintiff's] detriment," he should have suspected and investigated a possible conspiracy); 2 Areeda, et al., *Antitrust Law* ¶ 320 at 232 (2000 ed.) (ordinarily, statute of limitations begins to run once plaintiff begins to suspect violation that could have been detected with due diligence).

Plaintiffs do not argue that as of July 23, 1996, they did not know that they had been injured or that Sumitomo was potentially responsible for the injuries. They argue only that despite the newspaper reports, they did not know and could not have known as of this date that the J.P. Morgan defendants had played a part in producing their injuries. They are correct, but the point is not whether they would have *known* that defendants played a part; it is whether they knew enough to suspect a violation that they could have detected with due diligence or whether they had

knowledge of facts that would have led to actual knowledge in the exercise of reasonable diligence. It is clear that they did. The articles did not say simply that Sumitomo Corporation did its banking with defendants and that defendants might suffer losses as a result of their banking role; they said that the Commodities Futures Trading Commission was investigating who might have helped Yasuo Hamanaka arrange fictitious trades and that defendants were among the institutions that took an active part in those transactions. One does not have to be a sophisticated corporation to infer a possible connection between "who helped" and "the institutions that took an active part in those transactions." Just as Mr. Singletary should have investigated Continental Illinois National Bank's potential liability to him for booking a phony loan once Singletary knew that his local bank officer had worked with an officer at Continental, *Singletary*, 9 F.3d at 1243, plaintiffs should have been looking into defendants' role in the market manipulations as soon as they read the July 23, 1996 press reports.

The facts are not like those in *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir.1999), which plaintiffs cite for the proposition that the mere existence of newspaper reports does not constitute notice if the reports do not refer to the defendants' knowing participation in the market manipulation. In *Morton's Market,* the court held that newspaper articles about a scheme to rig bids for school milk contracts would not have alerted milk retailers to the possibility that defendants' price-fixing conspiracy had resulted in unlawfully high priced sales to retailers as well. *Id.* at 833 ("We know of no case, however, in which information involving one sort of antitrust violation by a defendant has been held, as a matter of law, to constitute notice of all other possible violations.") In this case, plaintiffs

knew from the news reports that Sumitomo and Hamanaka had engaged in market manipulation; it was probable that plaintiffs and other buyers of copper wire had been injured by the manipulation; and it was possible that defendants had played a role in the manipulation that injured them. This case can be characterized as a "same violation" case. *Id.* ("widely publicized earlier investigations of *exactly the same antitrust violations* were held to constitute adequate notice to others of their possible claims") (emphasis in original).

Nevertheless, plaintiffs maintain that they were not on "inquiry notice" until August 13, 1999, the date when the complaint in *Sumitomo Corp. v. J.P. Morgan & Co.* was unsealed. Until that time, they say, the published articles had characterized defendants as victims of the scandal, not intentional participants. In addition, the September 1996 congressional hearing did not raise any suspicion of defendants' having acted intentionally in the scandal. They argue that "inquiry notice" means not just having enough information to prompt an inquiry but enough information to know that defendants' involvement in the market manipulation was knowing and intentional.

To support their argument, plaintiffs cite securities fraud cases in which the Court of Appeals for the Seventh Circuit explained the distinction between "inquiry notice" and discovery of a violation. *E.g., Fujisawa Pharmaceutical Co. v. Kapoor,* 115 F.3d 1332, 1334–35 (7th Cir.1997) (doctrine known as "inquiry notice" refers to time when "the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year"). Because the statute of limitations for securities fraud is so short and is not subject to any equitable exten-

sions, "[t]he facts constituting [inquiry notice in such cases] must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Id.* at 1335. *See also Law v. Medco Research, Inc.,* 113 F.3d 781, 785 (7th Cir.1997) (adapting section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, to precise requirements of suit brought under Rule 10b–5 and holding that statute of limitations begins to run after injured party discovers that untrue statement was knowingly made or after he should have made such discovery had he exercised reasonable diligence.); *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 367 (7th Cir.1997) (injured party must have access to facts he needs for filing suit within the one-year limitations period).

It is reasonable in securities fraud cases to hold that an aggrieved party must know more about the cause of his injury before the statute starts to run, both because of the short limitations period and because of the particularity requirement for pleading fraud. *Law,* 113 F.3d at 785–86 (stating that in case complaining of false registration, all plaintiff needs to know before statute begins to run is that statement was untrue, but in fraud case plaintiff needs to know that defendant made representation that was *knowingly* false). No such provision needs to be made for plaintiffs in antitrust actions and none should be made. Not only are such actions subject to a much longer limitations period and subject to tolling defenses, but they arise under provisions enacted to encourage victims of antitrust injury to investigate diligently and "thereby to uncover unlawful activity." *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 195, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *Agency Holding Corp. v. Malley–*

*Duff & Assoc., Inc.,* 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees. Both statutes bring to bear the pressure of private attorneys general on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages.")

Plaintiffs have failed to make a persuasive case for finding a later date of accrual than the July 23, 1996 date I determined in the August 2003 order.

### B. *Equitable Estoppel*

■ Plaintiffs argue that defendants are equitably estopped from asserting a statute of limitations defense, first, because they have conceded that they made efforts to fraudulently conceal the evidence of their illegal agreement with Sumitomo before June 17, 1996, and second, because they took actions after that date to keep plaintiffs from learning the exact nature of their involvement in the market manipulation. Fraudulent concealment is a subset of equitable estoppel. *Shropshear v. Corp. Counsel of City of Chicago,* 275 F.3d 593, 597 (7th Cir.2001) (fraudulent concealment one "instantiation" of equitable estoppel). Generally, "fraudulent concealment" is used to refer to efforts by a defendant that prevent the plaintiff from learning of his injury or, in other words, delaying the accrual of the cause of action. 2 Areeda, et al. *Antitrust Law* ¶ 320 at 231 (2d ed.2000) (antitrust litigation adopts general doctrine that statute of limitations does not run while defendant's offense is fraudulently concealed).

Contrary to plaintiffs' suggestion, defendants have not conceded that they engaged in fraudulent concealment before July 23, 1996, only that they agreed for purposes of these motions not to challenge plaintiffs' assertion to that effect. Defendants' pre-July 23, 1996 actions are irrelevant to the pending motions. To the extent that defendants did engage in acts that concealed their illegal activities, their concealment ended no later than July 23, 1996. By then, plaintiffs had discovered their injury.

Although the concealment of the offense may have ended with the news reports in the summer of 1996, plaintiffs may resort to another subset of equitable estoppel if they can show that defendants wrongfully prevented them from suing during the four years after their claims accrued on July 23, 1996. (Plaintiffs do not rely on another tolling doctrine known as equitable tolling, under which an injured person can sue after the statute of limitations has expired if he can show that he was unable to sue before it ran despite any lack of fault or diligence on his part, even if the defendant took no active steps to prevent him from suing. *Singletary,* 9 F.3d at 1241. All of the plaintiffs have disavowed any reliance on this doctrine. Plaintiffs Southwire and Gaston Copper have done so explicitly, Plts.' Br., dkt. # 553, at 4, and the remaining plaintiffs implicitly by never advancing equitable tolling as a ground for extending the statute of limitations.)

"Equitable estoppel" refers to "[a]ny deliberate or otherwise blameworthy conduct by the defendant that causes the plaintiff to miss the statutory deadline." *Shropshear,* 275 F.3d at 597. The efforts must be above and beyond the wrongdoing upon which plaintiff's claim is founded, *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 451 (7th Cir.1990), and can include such acts as forging documents to negate any basis for suing or destroying evidence. *Id.* (equitable estoppel would apply if defendant had presented plaintiff with forged documents purporting to negate any basis for supposing age discrimination); *Ashafa v. City of*

*Chicago,* 146 F.3d 459, 462 (7th Cir.1998) (equitable estoppel requires defendant to take active steps such as destruction of evidence). In federal cases that do not involve claims of antitrust or RICO, the "plaintiff's lack of due diligence is not a defense" [to a claim of equitable estoppel], "because the defendant's conduct is deliberate." *Shropshear,* 275 F.3d at 597. *Klehr,* 521 U.S. at 195–96, 117 S.Ct. 1984, suggests but does not decide that it is an element of a claim of equitable estoppel in antitrust cases (as compared to a claim of fraudulent concealment of the claim itself).

In any event, plaintiffs have failed to show that they are entitled to an extension of the limitations period on the ground of equitable estoppel. To sustain such a claim at trial, plaintiffs would have to prove that defendants took active steps to prevent plaintiffs from suing before the statutory deadline. At the summary judgment stage, the burdens are reversed to some extent: to prevail, defendants must bear the burden of showing that no reasonable jury could find in favor of plaintiffs on this claim. It does not follow, however, that because defendants bear this burden at summary judgment plaintiffs are relieved of the obligation to adduce evidence. They must come forward with evidence sufficient to put the legal issue into dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (courts are to enter summary judgment against party who fails to make showing sufficient to establish the existence of element essential to that party's case and on which party will bear burden of proof at trial, after party has had adequate time for discovery).

Plaintiffs have not adduced evidence that would permit a finding that defendants engaged in inequitable conduct that would toll the statute of limitations. Defendants' confidentiality agreements, media policy and refusal to participate in a

congressional hearing are not the type of obstructive behaviors that warrant estopping defendants from pleading the statute of limitations defense. *E.g., Singletary v. Continental Illinois National Bank,* 9 F.3d 1236, 1241 (7th Cir.1993) (bank's insistence on validity of loan long after it knew loan was phony did not toll statute; "[i]t is not the denial of liability or a refusal to cooperate in making the plaintiff's case that extends the statute of limitations, but affirmative efforts to delay the plaintiff's bringing suit") (internal citations omitted); *Flight Attendants Against UAL Offset v. C.I.R.,* 165 F.3d 572, 577 (7th Cir.1999) ("Not being prompt and helpful is a lot different from actually preventing a plaintiff from suing in time.").

After reviewing considerable quantities of discovery materials, plaintiffs have unearthed three incidents that they contend add up to obstructionism sufficient to entitle plaintiffs to claim equitable estoppel. Defendants' managing director of global commodities made an allegedly untruthful statement to examiners of the Federal Reserve Bank and New York State Banking Department that defendants had had no suspicion about Hamanaka's dealings and no concern that a March 1996 trade with Sumitomo was unauthorized; defendants' London head of media relations destroyed a notebook containing his notes of conversations with media representatives; and J.P. Morgan Securities Ltd., an entity related to defendant J.P. Morgan Chase, declined to give information to the London Metals Exchange about a customer of defendant Morgan Guaranty Trust Company. These three incidents add up to nothing of significance. Defendants' statement in 1996 was made early in the limitations period and would have been drowned out by the many later news articles about defendants' relationship with Sumitomo. Destroying a notebook of press contacts is hardly obstructionist; at most, the note-

book's contents would sustain plaintiffs' complaints about defendants' press releases and statements to the press; it would be unlikely to disclose the substantive information plaintiffs think defendants were hiding. Plaintiffs have given no reason to suppose that J.P. Morgan Securities Ltd. had any obligation to provide information to the LME about another entity's customer.

Plaintiffs argue that they need additional time for discovery to ferret out other examples of defendants' efforts to create a smokescreen hiding their involvement in Sumitomo's market manipulation and they have brought a motion pursuant to Fed. R.Civ.P. 56(f), seeking additional time to conduct discovery. However, they have not explained why this additional evidence would help them meet their burden of showing equitable estoppel. A close look at the discovery they are seeking suggests that it is the same kind of evidence that defendants have produced already, relating to efforts by defendants to keep their names out of the news and avoid public identification as players in the market manipulation. Plaintiffs have had extensive opportunity for discovery. Their Rule 56(f) motion will be denied. (Plaintiffs seem to think that in an order entered on December 17, 2003, the magistrate judge confirmed that they had submitted evidence sufficient to meet their burden on summary judgment of showing that defendants took active steps to prevent plaintiffs from suing within the limitations period. A close reading of the order shows no such thing. The magistrate judge said that plaintiffs had filed numerous documents to support their contention that defendants took such steps and that more documents would only "change the quantity of evidence produced by plaintiffs, not its nature." Order entered Dec. 17, 2003, dkt. # 587, at 4. He did not say that plaintiffs had made this showing.)

Plaintiffs concede that by August 13, 1999, they had the requisite factual support to sue defendants for violation of the antitrust laws. (This is the date on which plaintiffs were on inquiry notice as they define it, that is, the date on which they had ready access to sufficient information to bring a claim against defendants. Plts.' Br., dkt # 553, at 19; Plts.' Br., dkt. # 589, at 17). This was more than eleven months before the statute of limitations would have run and after the publication of numerous articles that raised suspicion of defendants' intentional involvement in the market manipulation, including the April 7, 1997 article in *The Wall Street Journal,* speculating that defendants may have financed Hamanaka's transactions and the April 4, 1997 article in *American Metal Market,* noting that defendants had been disciplined for copper trading with Sumitomo.

Given the rising suspicions before August 13, 1999, the liberal pleading standards under Fed.R.Civ.P. 8(a) and the information available from the *Sumitomo* complaint, plaintiffs would not have needed more than eleven months within which to file a lawsuit against defendants without subjecting themselves to Fed.R.Civ.P. 11 sanctions, a concern plaintiffs repeatedly express. Plaintiffs overstate the threat. As the Supreme Court made clear in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), "Rule 8(a)(2) requires that a complaint include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *See also Samuels v. Wilder,* 906 F.2d 272, 274 (7th Cir.1990) (failure of proof does not imply Rule 11 violation; Rule 11 does not modify system of notice pleading established by Rule 8, but requires only outline of case). To state a claim against defendants, all plaintiffs needed to show was that defen-

dants knew that Sumitomo intended to restrain trade, that defendants intended trade to be restrained, and that defendants materially contributed to that restraint. *See, e.g., Loeb Industries,* 306 F.3d at 497.

Plaintiffs argue that defendants bear the burden of showing that once plaintiffs had discovered their injury, they could have found the information they needed from publicly available sources. It is unnecessary for defendants to make that showing when plaintiffs have acknowledged that they had enough information within the limitations period to file suit. Even without that acknowledgment, I would find that plaintiffs could have gathered the information they needed. It is undisputed that six different suits were filed against defendants within four years of July 23, 1996: *R.W. Strang Mechanical v. Sumitomo Corp.,* No. 701680 (Cal.Sup.Ct.1996) (complaint amended to add defendant J.P. Morgan on February 14, 2000); *Heliotrope General, Inc. v. Sumitomo Corp.,* No. 701679 (Cal.Sup.Ct.1996) (complaint amended to add defendant J.P. Morgan on February 14, 2000); *National Metals, Inc. v. Sumitomo Corp.,* No. 734001 (Cal.Sup. Ct.1999) (complaint amended to add defendant J.P. Morgan on February 14, 2000); *Heliotrope General, Inc. v. Credit Lyonnais Rouse, Ltd.,* No. 749280 (Cal.Sup.Ct. 2000) (complaint filed against defendant J.P. Morgan); *Loeb Industries, Inc. v. J.P. Morgan & Co.,* No. 00–C–0274–C (W.D.Wis.2000) (complaint filed on May 8, 2000); *Ocean View Capital, Inc. v. J.P. Morgan & Co., Inc.,* No. 00–CV–3756 (S.D.N.Y.2000) (filed May 17,2000). Plts.' Response Br., dkt. # 553, at 11. This is sufficient evidence to show that diligent persons were able to obtain the information they needed from public sources before the expiration of the limitations period. Moreover, plaintiffs have not shown that they relied on the acts of misconduct actually and reasonably. *Flight Attendants Against UAL Offset v. C.I.R.,* 165 F.3d 572, 576–77 (7th Cir.1999) (defendant's acts did not prevent plaintiff filing timely suit because plaintiff could have gotten information from another source); *Ashafa v. City of Chicago,* 146 F.3d 459, 463 (7th Cir.1998) (in order to invoke equitable estoppel, plaintiff must show that he actually and reasonably relied on misconduct).

*Klehr,* 521 U.S. 179, 117 S.Ct. 1984, suggests one last question about equitable estoppel: whether in an antitrust action in which plaintiffs have a special obligation to sue expeditiously to carry out the purposes of the laws, a plaintiff who is barred from suing by the lulling or active steps of a defendant is entitled to the full limitations period in which to sue after the defendant's obstruction has ended or whether he gets only such time as would be reasonably necessary to prepare and file a complaint. In other kinds of cases, plaintiffs who prove their entitlement to equitable estoppel may have the full period in which to file their suits. *E.g., Wolin v. Smith Barney Inc.,* 83 F.3d 847, 852 (7th Cir. 1996) (in ERISA case, plaintiff who establishes grounds for equitable estoppel has full statutory period in which to sue after estoppel has ceased to impede him, even if he did not attempt diligently to pursue his rights), but such an extension of the time to sue seems contrary to the goals of the antitrust laws. It is not necessary to decide this question in this case because I have found that plaintiffs had enough information as of July 23, 1996, to start the running of the statute at that time. It is probable, however, that even if plaintiffs could prove their claim that they did not have sufficient knowledge until August 13, 1999, a court would find that the eleven months remaining before the statute ran was sufficient time for them to begin a suit against defendants and that they did not need the benefit of the entire four-year limitations period.

As the Supreme Court has held on numerous occasions, persons bringing private antitrust actions have a special obligation to investigate possible violations diligently. It is not diligence to defer filing a suit until six years after learning of an injury after undertaking no more investigation than reading the newspapers. Diligence requires investigation by the injured party and not by the news media. Plaintiffs did nothing about suing until after the court of appeals has decided that purchasers of copper wire could bring antitrust claims against alleged conspirators.

I conclude that plaintiffs had until July 23, 2000, to bring their action against defendants, unless they find another way to toll the statute of limitations for at least two years, five months and seven days (using July 23, 1996, as the date on which the statute began to run and December 30, 2002, as the date on which plaintiff Southwire filed its complaint against defendants; all other plaintiffs filed their actions later than December 30, 2002, and would therefore need to toll the statute longer than plaintiff Southwire).

### C. Class Action Tolling

■ In *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." The Court extended this holding in *Crown, Cork & Seal Company, Inc. v. Parker,* 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), to all proposed class members, not just intervenors.

Relying on these holdings, plaintiffs argue that the *Heliotrope* actions tolled the statute from at least February 14, 2000, when the plaintiffs substituted defendants'

name for the "John Doe" defendants previously named, until at least December 30, 2002, for plaintiff Southwire or later in 2003 when the remaining plaintiffs requested exclusions from the *Heliotrope II* class or filed the present suit against defendants, for a total tolling period of at least three years, ten months and sixteen days. Plaintiffs could gain a tolling benefit from the *Heliotrope* actions if the present action arose from the same "evidence, memories, and witnesses as the subject matter of the [*Heliotrope* actions]." Plts.' Br., dkt. # 604, at 71 (citing *American Pipe,* 414 U.S. at 562, 94 S.Ct. 756 (Blackmun, J., concurring)); Plts.' Br., dkt. # 589, at 66. Plaintiffs argue that *Loeb* tolled the statute of limitations from May 8, 2000, when the case was filed, until September 20, 2002, when the Seventh Circuit affirmed the dismissal of the class action. Plts.' Br., dkt. # 589, at 75; Plts.' Br., dkt. # 553, at 68. Finally, plaintiffs Southwire and Gaston Copper argue that one can add together the tolling effect of the *Heliotrope* and *Loeb* actions to toll the statute sufficiently.

Although I did not need to decide in the August 19, 2003 and November 25, 2003 orders whether the *Heliotrope* class action tolled the statute of limitations for plaintiffs Southwire and Gaston Copper, I suggested in both decisions that in order to benefit from class action tolling, the class action must involve the same federal antitrust violations as the present actions. Aug. 19, 2003 order, dkt. # 504, at 17; Nov. 25, 2003 order, dkt. # 583, at 16. It is undisputed that the *Heliotrope* actions involved state law claims. The tolling effect given to the timely filing in *American Pipe* "depended heavily on the fact that [the filing] involved exactly the same cause of action subsequently asserted." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 467, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Plaintiffs dispute the precedential

effect of *Johnson*, arguing that the holding does not apply because "that case did not involve the tolling effect of a prior class action" and that another district court has held that *Johnson* did not require identical causes of action to benefit from tolling. Plts.' Br., dkt. # 589, at 73; Plts.' Br., dkt. # 604, at 75 (citing *CSU Holdings v. Xerox (In re Independent Service Organizations Antitrust Litigation)*, 1997 U.S. Dist. LEXIS 4496 (D.Kan.1997)).

Plaintiffs' argument is unpersuasive. In *Johnson*, the Court cited *American Pipe*, a class action tolling case, as support for the proposition that having identical causes of actions is an important consideration when deciding whether to allow a tolling benefit. *Johnson*, 421 U.S. at 467, 95 S.Ct. 1716. Requiring identical causes of action is reasonable. Federal and state laws governing market manipulations may differ in prescribing the types of entities that may recover under the law. *See, e.g., California v. ARC America Corp.*, 490 U.S. 93, 102–04, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (holding that federal antitrust laws permit only direct purchaser recovery and for that reason, do not preempt state laws permitting indirect purchaser recovery). Such differences between state and federal law undermine the statute of limitations' goals of notice and repose. *American Pipe*, 414 U.S. at 555, 94 S.Ct. 756 (policies of insuring fairness to defendants and barring plaintiff who "has slept on his rights" are satisfied when named class action plaintiff commences suit and thereby notifies defendants not only of substantive claims being brought against them, *but also of number and generic identities of potential plaintiffs* who may participate in judgment) (emphasis added). Thus, to claim a tolling benefit from a previous class action, the legal theory on which the class action plaintiffs sued must be the same as the theory used by the plaintiffs claiming the tolling benefit. Because the *Heliotrope* actions did not involve the same causes of action as those in plaintiffs' present case against defendants, plaintiffs may not claim any tolling benefit from the *Heliotrope* class actions.

Unlike the plaintiffs in the *Heliotrope* class actions, the plaintiffs in the *Loeb* class action asserted federal antitrust violations. Both sides agree that plaintiffs may claim a tolling benefit from *Loeb*, but they dispute the length of the benefit. Defendants argue that the *Loeb* class action tolled the statute of limitations from May 8, 2000, the date on which the action was filed, through this court's dismissal of the action on January 2, 2001, for a total tolling period of seven months and 25 days. Dft.'s Br., dkt. # 620, at 30. Plaintiffs argue that *Loeb* tolled the statute from May 8, 2000 until September 20, 2002, the date on which the Court of Appeals for the Seventh Circuit affirmed this court's decision dismissing the case with prejudice. Plts.' Br., dkt. # 589, at 75; Plts.' Br., dkt. # 553, at 71.

In the November 25, 2003 opinion and order, dkt. # 583 at 12, I decided that tolling stops once a court denies class certification. Plaintiffs acknowledge the case law supporting this decision, *see, e.g., Culver v. City of Milwaukee*, 277 F.3d 908, 914 (7th Cir.2002) (filing of class action suit tolls statute of limitations for all members of class, but statute resumes running for class members when suit dismissed without prejudice or when class certification denied), but they argue that dismissing the *Loeb* class action *with* prejudice and without ruling on the issue of class certification kept the statute of limitations running because the dismissal was immediately appealable. (*Loeb* was dismissed on the grounds of issue preclusion.) Therefore, plaintiffs argue, the statute should have continued to run until the court of appeals rendered its decision in *Loeb*.

Plaintiffs appear to believe that dismissing a case with prejudice and not making a direct decision on class certification is different enough from a case dismissed without prejudice or one in which the court makes a ruling on class certification to justify different tolling treatment. I disagree. The dismissal of *Loeb* with prejudice on issue preclusion grounds effectively denied class certification because the case could not continue. *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir.1998) (finding district court dismissal of previous class action for lack of subject matter jurisdiction rather than on adequacy of the class immaterial in determining whether putative class members benefit from statute of limitations tolling and explaining why lower courts should not follow dicta in *Jimenez v. Weinberger*, 523 F.2d 689, 696 (7th Cir.1975) that suggests statute of limitations should continue on appeal. (I denied class certification in *Loeb Industries, Inc. v. Merrill Lynch International, Inc.*, 99–C–377–C on August 24, 2000.) Plaintiffs assert incorrectly that defendants agree that the availability of an immediate appeal can extend the tolling effect of a denial of class certification. Plts.' Br., dkt. # 589, at 76. Defendants make no such concession. Rather, they maintain that the statute remains tolled only when plaintiffs seek interlocutory appeal through Fed.R.Civ.P. 23(f) and the district court or circuit court stays the proceedings. Dfts.' Br., dkt. # 575, at 43 n. 19. Interestingly, plaintiffs Southwire and Gaston Copper point out that the appeal in *Loeb* was immediate, rather than interlocutory. Plts.' Br., dkt. # 553, at 71.)

Any tolling benefit *Loeb* provided to plaintiffs ended on January 2, 2001. *Loeb* and the present action share the same federal antitrust cause of action; defendants concede that *Loeb* tolled the statute from May 8, 2000 until January 2, 2001; and plaintiffs have not shown that the tolling was longer. Therefore, *Loeb* tolled the statute of limitations for plaintiffs for seven months and 25 days.

Plaintiffs Southwire and Gaston Copper argue that one can stack the tolling effects of both the Heliotrope and Loeb class actions, but their argument is a nonstarter. I have already decided that the *Heliotrope* actions provides no tolling benefit. Furthermore, in the November 25, 2003 opinion and order, dkt. # 583 at 16, I concluded that class actions could not be stacked for tolling purposes. (Plaintiffs appear to have abandoned this argument in subsequent briefs filed in opposition to defendants' motion for summary judgment. Plts.' Br., dkt. # 604.)

*Loeb* provides plaintiffs with a tolling benefit of seven months and 25 days. To defeat defendants' motions for summary judgment, plaintiffs need an additional tolling period of at least one year, nine months and twelve days for a total of two years, five months and six days (using December 30, 2002, as the earliest date when plaintiffs began filing their lawsuits against defendants).

### D. *Tolling Agreements*

The parties disagree about the applicability of the standstill and tolling agreements entered into by defendants in the *In re Sumitomo Copper Litigation*. Plaintiffs contend that the agreements tolled the statute of limitations because the agreements applied to any claim or cause of action against defendants arising out of or relating to the events and transactions alleged in the *In re Sumitomo Copper Litigation* action. Defendants contend that the agreements do not apply to plaintiffs because plaintiffs never relied on those agreements when making the decision to sue defendants and that the *In re Sumitomo Copper Litigation* involved non-antitrust claims on behalf of traders in copper futures, not purchasers of physical copper. Dft.'s Br., dkt. # 620, at 32–33.

Plaintiffs admit that plaintiffs Leviton and American Insulated Wire would not benefit from the tolling agreements, but argue that the remaining plaintiffs would benefit from tolling because they were engaged in at least one futures transaction encompassed within the futures litigation class. Plts.' Br., dkt. # 589, at 78. Whether the tolling agreements apply to plaintiffs is an interesting question that I do not need to answer. If the agreements apply, they do not toll the statute of limitations for a sufficient length of time, even when added to the seven months and 25 days of tolling provided by *Loeb*. It is undisputed that the tolling agreements were in effect from September 3, 1997 through October 2, 1998 and from March 2, 1999 through June 11, 1999, for a total tolling period of one year, four months and eight days. If one adds the tolling effect of *Loeb*, the total tolling period is two years and three days. This amount is short by at least five months. Accordingly, I will grant defendants' motions for summary judgment against all plaintiffs.

### ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants J.P. Morgan & Co., Inc. and Morgan Guaranty Trust Company of New York is GRANTED against plaintiffs ASARCO Inc., Kennecott Utah Copper Corporation, Leviton Manufacturing Co., Inc., American Insulated Wire Corporation, Essex Electric, Inc., Mueller Copper Tube Company, Inc., Mueller Copper Tube Products, Inc., and Superior Tele-Com, Inc.;

2. Defendants' converted motion for summary judgment is GRANTED against plaintiffs Southwire Company and Gaston Copper Recycling Corporation;

3. The motion under Fed.R.Civ.P. 56(f) by plaintiffs Southwire Company and Ga-

ston Copper Recycling Corporation is DENIED as unnecessary;

4. Plaintiffs' unopposed March 2, 2004, motion to extend the pretrial schedule is DENIED as moot.

5. The clerk of court shall enter judgment for defendants and close each of these cases.